United States Court of Appeals,

Fifth Circuit.

No. 93-1550.

Adron L. MELDER, Etc., et al., Plaintiffs,

Adron L. Melder, Etc., et al., Plaintiffs-Appellants,

v.

Clifton H. MORRIS, Jr., et al., Defendants-Appellees.

Steven G. COOPERMAN, Plaintiff-Appellant,

v.

URCARCO, INC., et al., Defendants-Appellees.

Anthony HAND, et al., Plaintiffs-Appellants,

v.

URCARCO, INC., et al., Defendants-Appellees.

David J. STEINBERG, Etc., et al., Plaintiffs-Appellants,

v.

URCARCO, INC., et al., Defendants-Appellees.

Aug. 8, 1994.

Appeal from the United States District Court for the Northern District of Texas.

Before REAVLEY, JONES and BENAVIDES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

URCARCO operates a chain of "we finance" used car lots in Fort Worth, Dallas, Houston, and Austin. The company targets market areas with a high concentration of prospective purchasers who would otherwise have trouble locating financing because of their income levels, credit history, or inability to provide an adequate down

1

payment.[1]  The company launched an Initial Public Offering (IPO) in November 1989, and turned to the capital markets again in May 1990 with a Secondary Public Offering (SPO).  In April 1990, URCARCO's stock traded at a high of $255/8 per share, but in part following some critical reports in the financial press, the company's stock price nosedived to $107/8 per share by July 31, 1990.

This downturn precipitated the four consolidated securities fraud suits filed against URCARCO, its officers and directors, Coopers & Lybrand, and three securities underwriters—Merrill Lynch, Alex. Brown, and Cazenove.[2]  The plaintiffs alleged violations of §§ 11, 12(2), and 15 of the Securities Act of 1933, § 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, § 20(a) of the Exchange Act, state law misrepresentation, Tex.Bus. & Com.Code Ann. § 27.01, and common law fraud.  After allowing the plaintiffs to replead twice and conducting a hearing on this matter, the district court dismissed the *federal* securities fraud and common law fraud claims for

---

[1]The nature of URCARCO's business is prominently displayed in the first two paragraphs of the "Prospectus Summary" in the company's November 15, 1989 IPO and May 31, 1990 SPO prospectuses.

[2]The district court took particular interest in one of the plaintiffs, Steven Cooperman, described by the court as "one of the unluckiest and most victimized investors in the history of the securities business."  The court noted that Mr. Cooperman admitted in sworn interrogatories that he had been a plaintiff in 38 securities fraud cases.  The plaintiffs do not challenge this finding of the district court, but they do summon the courage to allege that the court was predisposed against securities fraud actions generally.  The district court's remarks in this case, however, reflect only a natural amount of skepticism in light of the suspect background of one of the "plaintiffs".

failure to plead fraud with particularity as required under Fed.R.Civ.P. 9(b).[3] We have reviewed the district court's dismissal on the pleadings de novo and AFFIRM.[4]

## I.

In general terms, all securities fraud claims require the plaintiff to establish: (1) a misstatement or omission (2) of a material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused the plaintiff's injury. *See Shushany v. Allwaste, Inc.,* 992 F.2d 517, 520 (5th Cir.1993). For its part, Rule 9(b) imposes certain pleading requirements on securities and other fraud claims:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Fed.R.Civ.P. 9(b). The application of the requirements of Rule 9(b) to securities fraud claims was recently addressed by this court in *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061 (5th Cir.1994) and *Shushany, supra.*

In *Shushany,* the court explained that Rule 9(b) requires certain minimum allegations in a securities fraud case, namely the specific time, place, and contents of the false representations,

---

[3]The district court declined to exercise jurisdiction over the plaintiffs' pendent state law claims. Because the appellants do not contest this aspect of the court's dismissal, this court need not address the propriety of their dismissal. *See Shushany v. Allwaste, Inc.,* 992 F.2d 517, 520-21 n. 5 (5th Cir.1993).

[4]The standard of review on a Rule 9(b) dismissal is the same as for a dismissal under Fed.R.Civ.P. 12(b)(6), namely de novo. *See Shushany v. Allwaste, Inc.,* 992 F.2d 517, 520 (5th Cir.1993).

along with the identity of the person making the misrepresentations and what the person obtained thereby.[5] *See Shushany,* 992 F.2d at 521 (quoting *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.,* 975 F.2d 1134, 1139 (5th Cir.1992)). The heightened pleading standard of Rule 9(b) serves an important screening function in securities fraud suits. As this court described in *Tuchman,*

> the heightened pleading standard provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims then attempting to discover unknown wrongs.

*Tuchman,* 14 F.3d at 1067.

Plaintiffs' complaint fails to meet the stringent pleading requirements of Rule 9(b) as explained in *Shushany.* As the district court concluded, the complaint here fails to put the defendants on notice, places defendants' reputations at risk, and burdens the courts with a potential strike suit. The task to which we now turn is showing precisely how the complaint fails to meet the requirements of Rule 9(b) on a defendant-by-defendant basis.[6]

---

[5]In applying the requirement of Rule 9(b) that "circumstances" be pleaded in detail to a securities fraud claim, the Seventh Circuit analogized the requirement to the essentials of the first paragraph of any newspaper story, namely the who, what, when, where, and how. *See DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990).

[6]Appellants maintain that their 1993 Securities Act claims were inappropriately subjected to the Rule 9(b) heightened pleading standard. This argument is untenable in light of the complaint's wholesale adoption of the allegations under the securities fraud claims for purposes of the Securities Act claims. When 1933 Securities Act claims are grounded in fraud rather than negligence as they clearly are here, Rule 9(b) applies. *See, e.g., Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 287-89 (3d Cir.), *cert. denied,* --- U.S. ----, 113 S.Ct. 365, 121

4

In terms of its allegations against URCARCO and its officer and directors, the complaint falls short of the heightened Rule 9(b) pleading requirements for at least two reasons. First, plaintiffs rely heavily on alleged misstatements made in the URCARCO prospectuses, but upon further review these alleged misstatements amount to gross mischaracterizations of the contents of the prospectuses. Second, the plaintiffs fail to plead scienter adequately under Rule 9(b).

As an initial matter, the plaintiffs fail to base their allegations on statements *actually* made by URCARCO, opting instead to selectively distort the company's public statements to create an inference of fraud. For example, the plaintiffs allege that in its IPO and SPO Prospectuses:

> the Company claimed to base its loss reserves on its own experience with delinquencies at a time when it had been selling cars for less than three years, so that none of its longer-term loans had yet been paid in full, and the Company had no reasonable basis for determining their delinquency rate[.]

C. 51 at ¶ 89(c).[7] In fact, however, this claim is belied in the prospectuses which clearly and prominently discuss URCARCO's limited operating history and its potential impact on the company's loan loss provision:

> The Company began operations in March 1987 and therefore has had only a limited operating history upon which prospective

---

L.Ed.2d 278 (1992); *Sears v. Likens,* 912 F.2d 889, 892-93 (7th Cir.1990).

[7]References are to the plaintiffs' consolidated amended class action complaint filed December 6, 1991.

> investors may base an evaluation of its performance ... Changes in historical experience caused by changes in economic conditions or other factors could require a change in the Company's periodic provision for losses.

IPO Prospectus at 5;  SPO Prospectus at 5.

Similarly misconstruing the company's public statements, the plaintiffs also allege that URCARCO in its "IPO Prospectus minimized the risk of default by the Company's customers."  C. 28 at ¶ 43.  The plaintiffs read the IPO Prospectus to stress "the Company's purported highly efficient and sophisticated collection procedures leading investors to believe that the Company's loans were not only safe, but constantly monitored."  *Id.*

These serious mischaracterizations of the IPO Prospectus find no support in the actual text of that document which clearly explains that URCARCO makes loans to high-risk customers:

> The Company finances its used car sales in a relatively high-risk market and anticipates that a portion of its retail sales contracts will become seriously delinquent and that in those circumstances the Company's only practical alternative is repossession of the cars.

IPO Prospectus at 5.  An interested reader need go no further than the second page of the IPO Prospectus to find a prominently displayed, clear explanation that the Company purposefully targets prospective purchasers of used cars "unable to obtain traditional car financing because of their income levels, credit history or inability to provide a sufficient down payment."  *Id.* at 2.

Significantly, the IPO explains the risk that URCARCO assumed to gain a competitive advantage:

> The Company believes that most used car dealers that finance purchases for their customers require approximately a 507 downpayment by these customers, so that the downpayment covers

6

the cost of the car for the dealer. The Company believes that its low downpayment financing for customers provides it a competitive advantage over most "we finance" dealerships selling used cars.

*Id.* at 21. No reasonable reader of the IPO Prospectus could conclude that URCARCO was somehow attempting to lead investors to believe its loans were "safe" when its express corporate purpose was to the contrary.[8]

---

[8]A careful review of both the IPO and SPO prospectuses inescapably leads to the conclusion that if plaintiffs' counsel had been bound under the same strictures concerning veracity as were the appellees under governing securities law standards, their complaint would have to be labeled misleading. Plaintiffs repeatedly allege "misrepresentations" in appellees' securities filings that mischaracterize those documents. Some examples of this tactic are repeated in the text *supra*. Others are as follows:

1. Plaintiffs allege that, contrary to representations that Urcarco required a cash down payment of 10 to 157, "Urcarco financed 1007 of many of its sales." C. 49 at ¶ 87(a). The prospectuses state, however, that: "A customer's down payment on a car sold by the Company typically ranges from 57 to 207 of the sales price, including the value of a trade-in, if any." IPO Prospectus at 4. This statement does not preclude the possibility of 1007 financing of sales when trade-ins are included.

2. The complaint states that, contrary to its representations, the Company used vertical integration as a means of artificially inflating its earnings by, for example, recording "sales" of repossessed cars from its lots to its wrecking and salvage facilities at amounts that it knew would never be realized. C. 49 at ¶ 87(c). One searches the IPO and SPO in vain for an intimation of this alleged misrepresentation. Those documents state only that vertical integration is "*a* means to utilize the remaining value of trade-ins, possessions and other cars considered by the company to be no longer suitable for re-sale." IPO Prospectus at 4 (emphasis added). No other statements or financial information support plaintiffs' claim of "artificial inflation" of such sales.

3. Plaintiffs' complaint alleges that the company claimed to use "highly sophisticated credit evaluation procedures" when in reality it had "no effective central

7

In addition to severely distorting the company's public statements in their complaint, plaintiffs do not merit a third opportunity to replead for still another reason, namely their

controls over its credit department." C. 28 at ¶ 42; C. 50 at ¶ 87(e). Again, there is no misstatement of this nature in the IPO and SPO. For instance, the IPO states that: "A prospective customer's credit status is carefully evaluated by the Company by verifying job history, residency and other pertinent information." IPO Prospectus at 4. The IPO further states that: "Most of the sales financed by the Company are to individuals who typically have limited access to credit, but satisfy sufficient other criteria stipulated by the Company, such as job and residence history, to lead the Company to believe that such person is an acceptable credit risk notwithstanding his inability to obtain traditional car financing." *Id.* at 23.

4. No one could misread the IPO and SPO, as plaintiffs' complaint does, to suggest that those documents misleadingly imply that repossessed cars were being restocked for retail resale at fair market value when in reality they were being auctioned off to dealers. *See* C. 29 at ¶ 44. On the contrary, the IPO describes that repossessed cars are assigned a "fair value, as estimated by the company taking into consideration its prior costs, its current wholesale value and other factors," and it clearly indicates that in some cases the repossessed autos may be turned over to the salvage operations. IPO Prospectus at 23-24. None of this is necessarily inconsistent with sending repossessed autos to auction when circumstances so necessitate.

5. Finally, the complaint states that the Company misrepresented its delinquency and repossession rates because it stated that it had a strategy of extending and working out even the most seriously delinquent loans and thereby "falsely assured the investing public that workouts were successful." C. 51 at ¶ 89(b). The IPO states the company's policy on seriously delinquent customers after a detailed description of its credit and collection procedures. *See* IPO Prospectus at 22-23. One may question the business judgment represented by the policy, but the IPO by no means suggests that this policy assures prospective investors that workouts are successful.

These allegations boil down to plaintiffs' attempt to chastise as fraud business practices that, in hindsight, might have been more cautious. Misjudgments are not, however, fraud.

8

failure to plead scienter adequately under Rule 9(b). The scienter element is satisfied by proof that the defendants acted with severe recklessness. *See Shushany,* 992 F.2d at 521. Although Rule 9(b) expressly allows scienter to be "averred generally", simple allegations that defendants possess fraudulent intent will not satisfy Rule 9(b). *See Tuchman,* 14 F.3d at 1068. The plaintiffs must set forth *specific facts* supporting an inference of fraud. *See id.* Because the complaint does not set forth specific facts to support an inference of fraudulent intent, dismissal under Rule 9(b) is appropriate as to the corporation and its officers and directors.

The plaintiffs attempt to meet their Rule 9(b) scienter burden by alleging that the defendants engaged in a conspiracy to commit securities fraud

> so that they could inflate the price of the Company's common stock in order to: (i) successfully bring to fruition the offerings; (ii) protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby; and/or (iii) enhance the value of their personal URCARCO's securities holdings and options.

C. 14-15 at ¶ 19. This lone allegation of motive is materially indistinguishable from the allegation made in *Tuchman* where we concluded that such an allegation did not set out facts sufficient to allow for a proper inference of scienter. *See Tuchman,* 14 F.3d at 1068-69. Accepting the plaintiffs' allegation of motive—basically that the defendant officers and directors were motivated by incentive compensation—would effectively eliminate the state of mind requirement as to all corporate officers and defendants. *See id.* The district court aptly dubbed this

9

allegation "a nihilistic approach to Rule 9(b) jurisprudence". Simply put, the lone allegation of motive is insufficient.

The defendants' motive to commit securities fraud is not readily apparent, as there is no allegation that any of the corporate defendants actually personally profited from the allegedly inflated stock values or the money raised from the two offerings. The plaintiffs therefore face a tougher standard for establishing fraudulent intent. *See id.* at 1068. Again, however, under this more stringent standard, plaintiffs' complaint fails to provide the specific facts upon which an inference of conscious behavior may be based. As the district court put it, "[t]he complaint's usual practice is simply to state that the defendants knowingly did this or recklessly did that." *See, e.g.,* C. 23 at ¶ 31 ("[T]he true adverse facts about URCARCO's financial condition ... were known to or recklessly disregarded by defendants."); C. 66 at ¶ 119 ("Because of their board membership and/or their executive and managerial positions with URCARCO, defendants ... knew or had access to information concerning the adverse non-public information about URCARCO's adverse financial outlook."). In short, because of the plaintiffs' failure to plead scienter adequately and their serious mischaracterization of the company's public statements, the complaint was properly dismissed as to URCARCO and its officers and directors.

### III.

As to defendant Coopers & Lybrand, the complaint fails to plead specific facts upon which inferences of fraudulent auditing

10

or fraudulent intent may be based and was therefore properly dismissed under Rule 9(b). The plaintiffs' boilerplate averments that the accountants violated particular accounting standards are not, without more, sufficient to support inferences of fraud. Further, the plaintiffs' only allegations of the accounting firm's intent in participating in the securities fraud are that the firm sought to

> (i) protect and enhance the substantial auditing and other fees received from URCARCO; (ii) maintain and increase its market share for auditing and accounting services to be performed and thereby increase the prestige and compensation of the Coopers and Lybrand partners responsible for the URCARCO engagement; (iii) increase the income received by the Coopers and Lybrand partners responsible for the URCARCO engagement since their income was directly tied to retaining engagements such as URCARCO; and (iv) maintain its competitive position as to other large accounting firms by retaining URCARCO as a client.

C. 16 at ¶ 21. As characterized by the district court, this is the familiar " "They did it for the Money' " chorus sung by the plaintiffs as to URCARCO and the individual defendants in part II *supra.* We are not moved by this music, and, on the same reasoning as in part II, must reject the plaintiffs' allegations of scienter as insufficient.

A contrary conclusion would universally eliminate the state of mind requirement in securities fraud actions against accounting firms. This follows from the indisputable proposition that accounting firms—as with all rational economic actors—seek to maximize their profits; that Coopers & Lybrand attempted to maximize profits is the essence of the plaintiffs' motive allegations.

Furthermore, while the plaintiffs' motive allegations merely describe behavior which could be alleged against auditors generally, in this case, it seems extremely unlikely that Coopers & Lybrand was willing to put its professional reputation on the line by conducting fraudulent auditing work for URCARCO. In an analogous examination of an accounting firm's motive to participate in securities fraud, the Seventh Circuit observed that

> [a]n accountant's greatest asset is its reputation for honesty, followed closely by its reputation for careful work. Fees for two years' audits could not approach the losses E & W would suffer from a perception that it would muffle a client's fraud.... E & W's partners shared none of the gain from any fraud and were exposed to a large fraction of the loss. It would have been irrational for any of them to have joined cause with Continental.

*DiLeo v. Ernst & Young,* 901 F.2d 624, 629 (7th Cir.), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). Likewise, we will not indulge irrational inferences of the firm's fraudulent intent based on these generic allegations.

Since Coopers & Lybrand's motive is not apparent, the plaintiffs can allege scienter only under a more stringent standard under which they must plead particular circumstances indicating the firm's conscious behavior. *See Tuchman,* 14 F.3d at 1068. Our review of the complaint and the appellant's brief reveals no such particularized pleading. Instead of pleading with particularity, the plaintiffs offer only rote conclusions, such as: "In the course of rendering services to URCARCO, Coopers and Lybrand either obtained knowledge of, or recklessly disregarded, the facts alleged herein." C. 10 at ¶ 12. This type of pleading fails to meet the requirements of Rule 9(b), and clearly implicates the kinds of

12

policy concerns motivating the heightened standards in Rule 9(b) noted in part I *supra.*  In short, the court correctly dismissed the complaint as to Coopers & Lybrand.[9]

                                    IV.

The district court also properly dismissed the complaint on Rule 9(b) grounds as to the final defendants, the securities underwriters, for failure to adequately plead scienter.  First, the plaintiffs' allegation as to the underwriters' motive for committing securities fraud does not set out facts sufficient to lead to a proper inference of scienter.  The plaintiffs merely allege that the underwriters "agreed to participate in the wrongdoing alleged herein in order to obtain substantial fees, expenses and discounts in connection with the Offerings."  C. 15 at ¶ 20.  This lone allegation of motive fails on precisely the same rationale discussed *supra* in parts II and III in relation to the other defendants.  Simply put, accepting the plaintiffs' allegation of motive as sufficient would make a mockery of Rule 9(b) by effectively eliminating the scienter requirement as to securities underwriters since all underwriters are, of course, fee seekers.[10]

---

[9]To the extent the complaint alleges aiding and abetting liability under § 10(b) of the Exchange Act against the underwriters and accountants, this form of liability has been foreclosed to private plaintiffs under the Supreme Court's recent decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* --- U.S. ----, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

[10]Furthermore, to think that the underwriters would put their valuable professional reputation at risk to ostensibly "profit" from two relatively minor securities offerings presents an inference of irrationality we refuse to indulge.  *Cf. DiLeo v. Ernst & Young,* 901 F.2d 624, 629 (7th Cir.), *cert. denied,* 498

13

Second, absent pleading an apparent motive that withstands scrutiny, plaintiffs face the tougher burden of pleading scienter by "identifying circumstances that indicate conscious behavior on the part of the defendant[s]." *Tuchman,* 14 F.3d at 1068. We have searched the plaintiffs' complaint for allegations of specific facts to support an inference of fraudulent intent, but have turned up nothing. Not surprisingly, appellants' brief is not helpful, citing only the portion of the complaint in which plaintiffs allege that each of the underwriters "either obtained knowledge or recklessly disregarded the facts regarding URCARCO's actual business prospects." C. 8-10 at ¶ 11(a)-(c). In short, after allowing the plaintiffs two opportunities to replead and a hearing on the motion to dismiss, the district court was absolutely correct in dismissing the complaint as to the securities underwriters and all other defendants.

V.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990) ("Fees for two years' audits could not approach the losses E & W would suffer from a perception that it would muffle a client's fraud.").