Richard GEIGER, individually and on behalf of others similarly situated, Plaintiff,

v.

The SOLOMON–PAGE GROUP, LTD., Herbert Solomon, Lloyd Solomon, Scott Page, Steven Tiffen, Eric Davis, Andrew Greene and Stratton Oakmont, Inc., Defendants.

No. 95 Civ. 3070 (JGK).

United States District Court, S.D. New York.

July 10, 1996.

Jonathan M. Plasse, Emily C. Komlossy, Goodkind Labaton Rudoff & Sucharow L.L.P., New York City, for plaintiff.

Steven G. Mintz, Cheryl Spinner, and Steven Samide, Mintz & Gold, New York City, for defendant Solomon–Page Group and the Individual Defendants.

Clifford Thau, Lance R. Suede, Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin, L.L.P., New York City, Elliot Cohen, Parker Chapin Flattau & Klimpl, L.L.P., New York City, for defendant Stratton Oakmont.

KOELTL, District Judge:

This is an action for securities fraud arising out of the October 1994 initial public offering of shares in defendant The Solomon–Page Group, Ltd. ("SPG"), a Delaware corporation with its principal place of business in

New York. Richard Geiger, a purchaser of SPG stock, asserts claims against SPG, its underwriter, Stratton Oakmont, Inc. ("Stratton"), and six individuals, (the "Individual Defendants"), who were directors of SPG and signatories to the registration statement filed with the Securities Exchange Commission, ("SEC"). In the Amended Complaint, Geiger alleges violations of § 11 of the Securities Act of 1933, (the "Securities Act"), 15 U.S.C. § 77k by all of the defendants, (Count I), of § 12(2) of the Securities Act, 15 U.S.C. § 77*l*(2), against SPG and Stratton, (Count II), and of § 15 of the Securities Act, 15 U.S.C. § 77*o*, against the Individual Defendants. (Count III.) Geiger also alleges violations by all of the defendants of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder. (Count IV.) Finally, Geiger asserts a supplemental claim for common law fraud against all of the defendants. (Count V.) The plaintiff seeks to certify this suit as a class action. (Am.Compl. ¶¶ 14–19.)

The defendants now move to dismiss the Amended Complaint on several grounds. First, the defendants argue that the alleged fraudulent misrepresentation or omission that forms the basis for the claims under §§ 11, 12(2), and 15 of the Securities Act and §§ 10(b) and 20(a) of the Exchange Act is not material, a defect that requires dismissal of those claims under Fed.R.Civ.P. 12(b)(6). Second, all of the defendants argue that the claims under the Securities Act and Exchange Act for securities fraud are not pleaded with particularity under Fed.R.Civ.P. 9(b). Finally, the defendants argue that the Court should decline supplemental jurisdiction over the common law fraud claim should the claims under the federal securities laws be dismissed. The plaintiff contests each of

these arguments and requests leave to replead to the extent additional particularity is required.

For the reasons that follow, the defendants' motions are granted and the Amended Complaint is dismissed.[1]

## I.

On a motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6), the allegations in the complaint are accepted as true, *Cohen v. Koenig,* 25 F.3d 1168, 1172–73 (2d Cir.1994), and all reasonable inferences must be made in the plaintiff's favor. *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989). The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir. 1985). Therefore, the motion should be granted only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *see Goldman,* 754 F.2d at 1065.

The Amended Complaint in this case includes quotes from the prospectus but does not incorporate the prospectus in its entirety. Nor is the prospectus attached to the Amended Complaint as an exhibit. Nonetheless, the defendants have submitted the complete prospectus and cite it liberally in their motions to dismiss, and the plaintiff has not objected to considering the prospectus. Accordingly, the prospectus may be considered in its entirety for purposes of this motion notwithstanding the fact that it was not fully incorporated into the Amended Complaint. *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.,* 75 F.3d 801, 808–09 (2d Cir.1996) (dis-

---

1. The defendants also argue that the other elements of a § 10(b) violation are not pleaded, including the requirement that the misrepresentation or omission be made "in connection with" the purchase or sale of securities, and the required elements of both transaction and loss causation. Because the defendants' motion is granted on the basis of materiality, and alternatively failure to plead fraud with particularity, there is no need to reach the arguments raised with

respect to these other elements of the § 10(b) claim.

Additionally, the "control person" claims under § 15 of the Securities Act and § 20(a) of the Exchange Act need not be analyzed separately because they are predicated on violations of §§ 11, 12(2) of the Securities Act and § 10(b) of the Exchange Act respectively—and those claims are dismissed.

trict court may consider full text of documents integral to the complaint even where only limited quotations included); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773–74 (2d Cir.1991) (text of documents filed with SEC of which plaintiff had notice may be considered).

Accordingly, the facts as alleged in the Amended Complaint and the relevant provisions of the prospectus are as follows.

On or about October 20, 1994, the defendants commenced an $8 million initial public offering ("IPO") of two million shares of common stock[2] of SPG. (Am.Compl. ¶¶ 1, 20; Prospectus at 1.) The securities were offered for sale pursuant to a Form SB–2 registration statement and prospectus filed with the SEC. (Am.Compl. ¶¶ 20, 27; Prospectus at 3.) As described in the prospectus, the shares were underwritten by Stratton on a "firm commitment" basis. (Prospectus at 45.) In other words, Stratton agreed to purchase all of the two million shares issued by SPG for $7.2 million which Stratton would then sell to the public at $4 per share, for a total of $8 million. The price differential represented Stratton's commission for underwriting the issue. By using a firm commitment form of underwriting, SPG was guaranteed $7.2 million for its shares regardless of how successfully Stratton was able to sell those shares to the public. *See generally* Louis Loss & Joel Seligman, *Fundamentals of Securities Regulation* at 58–66 (3d ed.1995) (describing dynamics of firm commitment underwriting).

Pursuant to the registration statement and prospectus, 1,050,000 previously issued unregistered shares of SPG were registered and permitted to be sold to the public. The largest owner of these shares was Craig Michael Corp., ("CMC"), a company owned and controlled by one of the Individual Defendants, Lloyd Solomon. (Am.Compl. ¶ 10(b).) Pursuant to the prospectus, CMC was permitted to sell the 945,000 shares of SPG stock it owned. (Prospectus at 39.) The remaining 105,000 previously issued shares were owned by nine individuals named in the prospectus. (Am.Compl. ¶ 11(b); Prospectus at 39.) The prospectus referred to these individuals as the "Unaffiliated Selling Shareholders." (Prospectus at 1.) The Unaffiliated Selling Shareholders, along with CMC and certain other individuals, were collectively referred to as the "Selling Securityholders." (Prospectus at 1, 39.) The names of the Unaffiliated Selling Shareholders were listed in the prospectus along with the number of shares owned by each. The prospectus indicated that none of the Unaffiliated Selling Shareholders was "an affiliate of [SPG]." (Prospectus at 39.)

The plaintiff alleges that the statement that the Unaffiliated Selling Shareholders were not affiliates of SPG was false and misleading because the Unaffiliated Selling Shareholders were brokers employed by Stratton who had received their previously unregistered SPG shares in 1993 at very low prices. (Am.Compl. ¶ 22.) According to the plaintiff, the Unaffiliated Selling Shareholders made substantial profits when they sold their collective 105,000 shares. (Am.Compl. ¶ 22.) It is not the number of shares, however, or the fact that the Unaffiliated Selling Shareholders were able to sell their shares to the public that constituted the misleading aspect of the prospectus. Instead, the plaintiff maintains that the prospectus was misleading because the Unaffiliated Selling Shareholders were employed as brokers by Stratton and therefore had an affiliation with SPG.[3] The plaintiff alleges that when this

---

**2.** The shares of common stock were accompanied by detachable warrants. Also, Stratton, the underwriter, was given a three-year option to purchase an additional 200,000 shares starting two years after the IPO. Stratton also received a thirty-day option to purchase an additional 300,000 shares to cover overallotments of shares in the IPO. (Prospectus at 1–3.) None of these features of the IPO are alleged to be germane to this motion.

**3.** With respect to the shares owned by the Unaffiliated Selling Shareholders, the defendants maintain that another provision in the prospectus makes it clear that "[s]ales of such securities or even the potential of such sales at any time may have an adverse effect on the market prices of the securities offered hereby." (Prospectus at 1; *see also* Prospectus at 40.) The defendants argue that this cautionary language in the prospectus undermines any action for securities fraud based on the impact of the sales of the

undisclosed relationship became known as the result of an article appearing in The New York Times on November 13, 1994, the price of SPG stock dropped from $5.62 per share before the article appeared to $4.25 per share eight days later. (Am.Compl. ¶ 23.)

Had the plaintiff known of the undisclosed relationship of the Unaffiliated Selling Shareholders to Stratton and SPG, he alleges he would not have purchased his 3000 shares on October 26, 1994 at $6.875 per share. (Am. Compl. ¶ 8, 23.)

On the basis of the preceding allegations the plaintiff claims that the defendants violated the securities laws. The defendant argues that the allegations are insufficient in several ways.

## II.

 The defendants' first argument—that the alleged misrepresentation or omission was not material—is potentially dispositive of all of the plaintiff's claims. Materiality is a required element for claims under the Securities Act under §§ 11 and 12(2), as well as under the Exchange Act pursuant to § 10(b) and Rule 10b–5. *Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 57–58 (2d Cir.1996); *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 761 (2d Cir.1991). A misrepresentation or omission is material if there is a substantial likelihood that a reasonably prudent investor would consider it important in making a decision. *Basic Inc. v. Levinson*, 485 U.S. 224, 231, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) ("There must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."); *Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539, 540–41 (2d Cir.1996). Generally, materiality is a mixed question of law and fact ordinarily left to the finder of

fact to determine. *TSC*, 426 U.S. at 450, 96 S.Ct. at 2132–33. The question of materiality may be decided as a matter of law on a motion to dismiss if the alleged omission is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance." *Feinman*, 84 F.3d at 541 (quoting *Goldman*, 754 F.2d at 1067). "The central inquiry in determining whether a prospectus is materially misleading ... is therefore whether defendants' representations, taken together and in context, would have [misled] a reasonable investor about the nature of the investment." *I. Meyer Pincus*, 936 F.2d at 761 (quotations omitted) (second alteration in original).

 This case concerns a section of the prospectus relating to shareholders of unregistered shares who were permitted to sell their shares under the prospectus. SEC regulations govern the information required to be included in the prospectus and registration statement. Regulation S–B regulates the disclosure required of certain small businesses such as SPG. *See* 17 C.F.R. § 228.10. Disclosure of information about shareholders offering securities pursuant to a registration statement and prospectus is required by Item 507 of Regulation S–B, which provides:

> If security holders of a small business issuer are offering securities, name each selling security holder, *state any position, office, or other material relationship which the selling security holder has had within the past three years with the small business issuer or any of its predecessors or affiliates,* and state the amount of securities of the class owned by such security holder before the offering, the amount to be offered for the security holder's account, the amount and (if one percent or more) the percentage of the class to be owned by such security holder after the offering is complete.

17 C.F.R. § 228.507 (emphasis added).

In this case, the prospectus provided, in relevant part:

shares owned by the Unaffiliated Selling Shareholders. As the plaintiff's counsel explained during oral argument, however, the plaintiff does not base his claims on the adverse impact from the potential or eventual sales of the shares owned by the Unaffiliated Selling Shareholders—

it is only the undisclosed relationship between those shareholders, Stratton, and SPG that the plaintiff alleges was a materially misleading nondisclosure. (*See* Tr. of Oral Arg. of Sept. 8, 1995, at 31–32.)

945,000 of the 1,050,000 Shares are being offered by CMC.... The remainder of the Shares are being offered by the following persons, *none of whom is an affiliate of the Company*, in the amounts set forth below.

| Shareholder | Number of Shares Owned Prior to Offering |
|---|---|
| Irv Stitsky ............... | 28,875 |
| Jordan Shamah ......... | 15,750 |
| Steve Sanders .......... | 15,750 |
| Howard Gelfand ........ | 10,500 |
| Neil Kiperman .......... | 10,500 |
| Ira Boshnack........... | 7,875 |
| Eric Blumen ............ | 7,875 |
| Matthew Bloom......... | 3,937.5 |
| Joseph Teseo........... | 3,937.5 |

The Securities offered hereby may be sold from time to time directly by the Selling Securityholders. Alternatively, the Selling Securityholders may from time to time offer such securities through underwriters, dealers or agents.... The Selling Securityholders and intermediaries through whom such securities are sold may be deemed "underwriters" within the meaning of the [Securities] Act with respect to the securities offered, and any profits realized or commissions received may be deemed underwriting compensation.

. . . .

*Sales of securities by the Selling Securityholders or even the potential of such sales would likely have an adverse effect on the market prices of the securities offered hereby.*

(Prospectus at 39–40 (emphasis added).)

The plaintiff contends that the statement that the Unaffiliated Selling Shareholders were not affiliated with SPG was misleading because the nine listed persons were employed by Stratton, SPG's underwriter and that the representation in the prospectus implied that no such employment relationship existed. The plaintiff also argues that the

fact that the listed persons were employed by Stratton is material because of the importance such information would play in an investor's evaluation of the offering.

Materiality is a common element in each of the plaintiff's claims. Rule 10b–5 promulgated by the SEC pursuant to section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), prohibits the making of "any untrue statement of a material fact or [omission of] a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5. Section 11(a) of the Securities Act provides a cause of action when any part of a registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 12(2) of the Securities Act imposes liability on any person who offers or sells a security "by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l (2).

In this case, there is no allegation that any statement in the prospectus was untrue. The names of the Unaffiliated Selling Shareholders and the number of shares owned by each were disclosed accurately, as was the fact that the Unaffiliated Selling Shareholders were not affiliated with SPG.[4] Moreover, the prospectus disclosed that the market price of SPG shares could be adversely effected by sales of the shares owned by the Unaffiliated Selling Shareholders or even by

---

4. There is no allegation in this case that the Unaffiliated Selling Shareholders were affiliated with SPG. The term "affiliate" is not defined in Regulation S–B. It is defined in Rule 405 of Regulation C of the Securities Act, however, which provides that: "An 'affiliate' of, or person 'affiliated' with, a specified person, is a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified." 17 C.F.R. § 230.405. The term "control"

is also defined in Rule 405: "The term 'control' (including the terms 'controlling,' 'controlled by' and 'under common control with') means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Id.* There is no allegation in this case that Stratton or any of the Unaffiliated Selling Shareholders controlled SPG.

the potential for sales of those shares. None of this is even alleged to be untrue.

Nor was the information omitted from the SPG prospectus necessary to prevent the representations made there from being misleading. The statement that "[s]hares are being offered by the following persons, none of whom is an affiliate of the Company" was truthful and not misleading. Item 507 of Regulation S–B requires disclosure of any affiliation with the Company, in this case SPG, and the prospectus accurately states that there was none. It does not state that the Unaffiliated Selling Shareholders had no relation to the underwriter, and Item 507 does not require such a disclosure. The only information the statement in the prospectus conveys in and of itself is that the nine individuals were not affiliated with SPG or SPG's affiliates. And the plaintiff does not allege that this statement is untrue. No reasonable investor would infer from such a statement that there was no relationship between the nine individuals and any other company or person because the statement does not provide a basis for any reasonable conclusion about other relationships the nine people might have had. Therefore, nothing about the disclosures in the prospectus is misleading in a way that would require disclosure of the omitted information.

The plaintiff argues that this information is material because it changes the perception of Stratton's impartiality and credibility. The plaintiff argues that the fact that employees of the underwriter stood to gain from sales of their own shares changes the perception of Stratton's interests in the underwriting. With knowledge of this fact, the plaintiff argues, an investor would place less faith in the reputation of the underwriter and would make a more independent inquiry into the fairness of the offering price before purchasing any SPG shares.

The crux of the plaintiff's position is that the underwriter's motivation to select a fair offering price for the shares, or the perception of that motivation, is altered by the fact that nine of its employees owned shares that would be registered as part of the underwriting. The plaintiff alleges that the ultimate disclosure of that fact in a newspaper article led to a significant decline in the price of SPG shares, revealing the importance of the Unaffiliated Selling Shareholders' employment relationship to the perception of Stratton's role in the underwriting.

The plaintiff's position is untenable because the SPG offering was underwritten by Stratton on a firm commitment basis. Under the terms of the underwriting, as fully disclosed in the prospectus, if any shares were purchased, Stratton undertook to purchase the entire two million shares from SPG for $7.2 million and to sell them to the public at $4 per share. When the entire two million shares were sold, Stratton would realize all of the proceeds from such sales and its commission would be the excess of those proceeds over the $7.2 million paid to SPG, namely $800,000. Any risk from the failure to sell the two million shares at $4 per share was assumed by Stratton because it had committed to buy all of those shares from SPG. There is nothing about the fact that certain Stratton employees may have also stood to gain from the $4 per share price for SPG shares that changes Stratton's role in this firm commitment underwriting in any material way.

The plaintiff's argument suggests that investors would look with more skepticism at the $4 offering price negotiated by Stratton if they knew that nine employees of Stratton held 105,000 shares of SPG. It strains credulity to believe that an underwriter that has paid $7.2 million for two million shares would set a price for the shares to be sold to the public based on the 105,000 shares held by nine of its employees. Stratton already had a powerful and fully disclosed interest in setting the best price for the two million shares which it had committed to buy and sought to sell to the public. No reasonable investor could have viewed the shares held by the nine employees as important in assessing Stratton's reasonableness and objectivity in negotiating the offering price for the shares in view of Stratton's own far more substantial stake that was fully disclosed in the prospectus.

Apart from the alleged change in perception of Stratton's objectivity or the fairness of the offering price, the plaintiff does not

allege how Stratton would benefit if the Unaffiliated Selling Shareholders were able to sell their newly registered shares at a higher price. In fact, selecting a high offering price would directly benefit Stratton far more given the two million shares it was offering. Whatever motive Stratton could possibly have had based on the relatively small number of shares owned by nine of its employees would be utterly dwarfed by its own interests in a successful and profitable offering. And that interest and the dynamics of the firm commitment underwriting were fully disclosed in the prospectus.[5]

Accordingly, under the circumstances of this case, particularly the nature of the underwriting, and in light of the information that was disclosed in the prospectus, the fact that the nine Unaffiliated Selling Shareholders were employed by Stratton is so obviously unimportant that reasonable investors would not differ on its lack of importance. Therefore, the omitted information is not material and cannot provide the basis for an action under §§ 11 and 12(2) of the Securities Act or § 10(b) or Rule 10b–5 of the Exchange Act.

This conclusion is supported by the absence of any requirement in Item 507 of Regulation S–B that relationships between selling security holders and the underwriter be disclosed. The defendants argue that the absence of any such disclosure requirement under the SEC regulations is dispositive on the question of materiality. The plaintiff argues that even if disclosure was not required under Item 507, the materiality of the information about the Unaffiliated Selling Shareholders' employment relationship to Stratton remains a question of fact.[6]

Neither party has cited a case on point on this issue. *Cf. Degulis v. LXR Biotechnology, Inc.,* 928 F.Supp. 1301, 1313–14 (S.D.N.Y. 1996) ("no authority suggests that Regulation S–K is preemptive of the materiality requirement"). The plaintiff relies on authority for the converse proposition that the inclusion of a particular item of information in an SEC disclosure regulation does not establish materiality of that item per se. *See United States v. Bilzerian,* 926 F.2d 1285, 1298 (2d Cir.) ("[W]e decline to hold that the information required to be disclosed in [Regulation] 13D is material per se for purposes of § 10(b) simply because such disclosure is required under the securities laws."), *cert. denied,* 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991).

The fact that disclosure is required by the securities laws is evidence of materiality, however. *See id.,* 926 F.2d at 1298; *see also General Elec. Co. v. Cathcart,* 980 F.2d 927, 937 (3d Cir.1992) ("Although not determinative, Schedule 14A is persuasive authority as to the required scope of disclosure in proxy materials, as the regulation provides 'us with the [SEC's] expert view of the types of involvement in legal proceedings that are most likely to be matters of concern to shareholders in a proxy contest.'" (quoting *GAF Corp. v. Heyman,* 724 F.2d 727, 739 (2d Cir.1983)) (alteration in original)).

The absence of a regulation requiring disclosure, in the face of the detailed requirements of what information about selling shareholders must be disclosed, is some evidence that the information the plaintiff seeks to require is not in fact material. As explained above, the fact that the Unaffiliated Selling Shareholders were employed by Stratton is not material. The fact that the SEC does not require disclosure of this fact

---

5. The prospectus disclosed: "Prior to this Offering, there has been no public market for the Units, Common Stock or Class A Warrants. Consequently, the offering price and the exercise price of the Warrants have been determined by negotiations among the Company and the Underwriter.... The initial public offering price of the Units is not necessarily related to or indicative of the Company's assets, book value, earnings, net worth or any other established criteria of value." (Prospectus at 47–48.)

6. The plaintiff also argues that the employment relationship of the Unaffiliated Selling Share-

holders with the underwriter falls within the scope of the phrase "other material relationship" in Item 507. The plaintiff cites no authority for such an interpretation, and it is essentially circular. This argument is at odds with the plain language of Item 507 which provides for disclosure of such a relationship "with the small business issuer or any of its predecessors or affiliates." The plaintiff does not allege that Stratton was either a predecessor or affiliate of SPG. Moreover, as explained above, there is no independent basis to conclude that this information is material.

**1188**

is further support for this conclusion because it reflects the SEC's expert view that such disclosure is not required.

The plaintiff argues that the decrease in the market price of SPG shares immediately following the disclosure of the fact that the Unaffiliated Selling Shareholders were Stratton employees is evidence of the materiality of the omission. Evidence of stock price movement may be relevant to the issue of materiality but it is not determinative. *See, e.g., Bilzerian,* 926 F.2d at 1298; *compare Akerman v. Oryx Communications, Inc.,* 609 F.Supp. 363, 368 (S.D.N.Y.1984) (lack of significant decrease in stock price following disclosure did not establish immateriality as a matter of law), *aff'd,* 810 F.2d 336 (2d Cir. 1987) *with SEC v. Bausch & Lomb Inc.,* 565 F.2d 8, 15–16 (2d Cir.1977) (considerable decrease in stock price did not establish materiality per se). The stock price may have fallen for many reasons including other negative disclosures included in the very same newspaper article which were not alleged as the basis for a fraudulent omission in this case. In any event, even accepting as true the plaintiff's allegations about the reaction in the market to the publication of the omitted fact, that evidence is not sufficient by itself to demonstrate the materiality of the omission from the prospectus in light of the plain unimportance of that specific information.

Accordingly, the omission the plaintiff alleges as the basis for each of his claims under the Securities Act and the Exchange Act relates to an item of information that is not material as a matter of law. Because materiality is an element of each of the plain-

tiff's claims and because the omission in this case is not material as a matter of law, the defendants' motion to dismiss the complaint on this basis is granted.

**III.**

The defendants also move to dismiss the Amended Complaint for failure to plead fraud with particularity under Fed.R.Civ.P. 9(b) with respect to all of the claims.

**A.**

■ Allegations of securities fraud under § 10(b) and Rule 10b–5 are subject to the requirements of Fed.R.Civ.P. 9(b) regarding scienter.[7] *See Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995); *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127–28 (2d Cir.1994). To plead scienter properly, a plaintiff must allege facts giving rise to a strong inference of fraudulent intent. The inference may be established either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields,* 25 F.3d at 1128; *see In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 268–69 (2d Cir.1993), *cert. denied sub. nom Ross v. ZVI Trading Corp. Employees' Money Purchase Pension Plan,* — U.S. —, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994). While Rule 9(b) only requires that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally," this somewhat more relaxed pleading requirement "must not be mistaken for license to base claims of fraud on speculation and conclusory allega-

---

7. Rule 9(b) also requires that the complaint identify the statements alleged to be fraudulent, who made the statements, when and where the statements were allegedly made, and why the statements were fraudulent. *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993); *Ross v. Bolton,* 904 F.2d 819, 823 (2d Cir.1990) ("The time, place, and nature of the misrepresentations must be set forth so that the defendant's intent to defraud ... under the securities laws is revealed."). The defendants do not seriously dispute the adequacy of the Amended Complaint in this regard because it does allege a particular omission of a specific fact from the prospectus. The defendants do protest that the Amended Complaint fails to specify the particular omission

attributable to each of the Individual Defendants. When an alleged fraudulent omission occurs in an offering memorandum filed with the SEC signed by each of the Individual Defendants, however, there is no requirement that the complaint be any more particular to comply with Rule 9(b) in this respect. *See DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987) ("no specific connection between fraudulent representations in the Offering Memorandum and particular defendants is necessary where, as here, defendants are insiders or affiliates participating in the offer of the securities in question" (quoting *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986))).

tions[,]" *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990), in light of Rule 9's purpose of providing defendants with fair notice of the plaintiff's claims, safeguarding defendants' reputations from improvident allegations of malfeasance, and protecting defendants against strike suits. *O'Brien v. National Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir.1991).

■ The defendants argue that the plaintiff's claims under §§ 11 and 12(2) of the Securities Act are also subject to the pleading requirements of Rule 9(b) because each is based on the same allegation of fraud that underlies the plaintiff's § 10(b) claim under the Exchange Act. Unlike § 10(b), claims under §§ 11 and 12(2) of the Securities Act do not require the element of fraud, and a complaint asserting such claims would not ordinarily be subject to Rule 9(b). *See, e.g., In re Lilco Sec. Litig.*, 625 F.Supp. 1500, 1503 (E.D.N.Y.1986) ("as fraud is not required for a § 11 claim, it need not be pleaded pursuant to Rule 9(b)"); *Ross v. Warner*, 480 F.Supp. 268, 273 (S.D.N.Y.1979) ("section 11 does not require proof of fraud, and therefore, the Rule 9(b) particularity requirement does not apply" (citation omitted)). Where the allegations underlying claims under the Securities Act are also based in fraud, however, Rule 9(b) has been applied to § 11 and § 12(2) claims. *See, e.g., In re Chaus Sec. Litig.*, No. 88 Civ. 8641, 1990 WL 188921, at *10 (S.D.N.Y. Nov. 20, 1990) (Rule 9(b) applies "to the extent that plaintiff's §§ 11 and 12(2) claims also sound in fraud"); *Moran v. Kidder Peabody & Co.*, 609 F.Supp. 661, 666 (S.D.N.Y.1985) (section 12 claim sounded in fraud when based on same alleged misstatements on which § 10(b) claim was based), *aff'd without opinion*, 788 F.2d 3 (2d Cir. 1986); *see also Melder v. Morris* 27 F.3d 1097, 1100 n. 6 (5th Cir.1994) ("When 1933 Securities Act claims are grounded in fraud rather than negligence ... Rule 9(b) applies.").

The defendants argue that all of the plaintiff's claims are based on the same underlying allegedly fraudulent omission: the undisclosed employment relationship between the Unaffiliated Selling Shareholders and Stratton. (*See* Am.Compl. ¶¶ 28, 35, 46.) In fact,

the entire Amended Complaint is couched in the terms of a "securities fraud action" and alleges that the sellers of the shares, who possessed material inside information, sold the shares pursuant to a false and misleading registration statement. (*See* Am.Compl. ¶¶ 1, 2, 12, 13.) On that basis, the defendants argue that each of the plaintiff's claims should be pleaded in compliance with Rule 9(b). And it is true that all of the plaintiff's claims are premised on and incorporated by reference the same single omission which is alleged to have been fraudulent. (*See* Am. Compl. ¶ 22.)

The plaintiff does not dispute that all of the claims should be tested under Rule 9(b) but argues that the Amended Complaint does in fact satisfy the rule. Accordingly, all of the claims in the Amended Complaint shall be measured against the pleading requirements of Rule 9(b).

### B.

■ The Amended Complaint fails to plead scienter sufficiently pursuant to Rule 9(b) with respect to all of the claims. The Amended Complaint does not allege facts from which the necessary strong inference of fraudulent intent may be drawn, either by means of motive or conscious misbehavior or recklessness.

The plaintiff argues that SPG and its officers and directors, the Individual Defendants, had a motive to commit fraud in order to raise the $7.2 million in the IPO of SPG shares. (*See* Am.Compl. ¶¶ 1, 9.) The plaintiff also alleges that the Individual Defendants wished to "increase the price of the securities of [SPG] thereby allowing certain of the Individual Defendants and individuals affiliated with Stratton to sell SPG securities at inflated prices...." (Am.Compl. ¶¶ 13; *see also* Am.Compl. ¶ 48.)

As the defendants correctly observe, however, a company issuing its stock to the public always has a generalized motive to ensure the success of the issue and to raise as much money as possible. Likewise, the officers and directors of the issuing company always have a nonspecific interest in a successful IPO. Allegations of these interests

are not of themselves sufficient allegations from which a strong inference of fraudulent intent may be drawn. *See San Leandro,* 75 F.3d at 814 (desire to maintain successful bond rating not sufficient motive); *Acito,* 47 F.3d at 54 (noting that increased executive compensation resulting from a higher stock price cannot alone provide a motive for securities fraud or "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions"); *Melder,* 27 F.3d at 1102 (insufficient allegation of scienter under Rule 9(b) to allege motive because defendant directors had an interest in a successful IPO and secondary public offering, enhancing their executive compensation and prestige and increasing the value of their own shares). Moreover, officers and directors typically have part of their compensation linked to the price of the company's shares and will naturally have an interest in a high stock price based on this link. Such an unparticularized interest in executive compensation tied to stock price performance is not a sufficient motive for fraud. *Acito,* 47 F.3d at 54. Nor does a conclusory allegation of a defendant's stock ownership provide a sufficient motive without allegations of the specific circumstances of the sales of such shares giving rise to a strong inference of an intent to deceive the investing public. *Acito,* 47 F.3d at 54; *Shields,* 25 F.3d at 1131. The Amended Complaint fails to provide such specifics.

Even if the plaintiff's conclusory allegations of motive were sufficient to satisfy Rule 9(b), these motives are further diluted in this case because SPG's offering was underwritten on a firm commitment basis. SPG and the Individual Defendants knew that the IPO would generate $7.2 million because that was the amount Stratton agreed to pay to SPG in exchange for the two million shares. Whatever the success of the subsequent public sale of those shares, SPG and the Individual Defendants were assured of raising $7.2 million for SPG. Therefore, the plaintiff's allegation that concern about the success of the offering and the receipt of the proceeds provided a motive for fraud as to the plaintiff is not sufficient to raise a strong inference of fraudulent intent on the part of SPG and the Individual Defendants.

Nor is a strong inference of fraudulent intent raised by the plaintiff's allegation that SPG and the Individual Defendants were interested in enabling the Unaffiliated Selling Shareholders employed by Stratton to reap extraordinary profits from the sales of their SPG shares. Apart from the vague allegation that the defendants were somehow interested in the financial well-being of these Stratton employees, there are no facts pleaded that would substantiate such a motive. Such a conclusory allegation of motive does not begin to satisfy Rule 9(b).

In regard to Stratton, the Amended Complaint is similarly deficient in pleading motive. The plaintiff argues that Stratton had a motive for fraud based on its interest in enabling its employees to sell their SPG holdings at inflated prices, (*see* Am.Compl. ¶ 13), and to generate for Stratton approximately $800,000 in underwriting commissions. (*See* Am.Compl. ¶ 22.) The fact that Stratton's employees might sell their shares of SPG at a profit is not a fact from which a motive for fraud derives because there is nothing pleaded in the Amended Complaint to suggest how Stratton would benefit from such sales. Without additional allegations setting forth with particularity how Stratton could be motivated to enhance the value of its employees' personal holdings, the plaintiff has succeeded only in pleading generosity and not scienter.

Stratton's alleged motive to earn its underwriting commission is not alone sufficient to sustain a strong inference of fraudulent intent. If it were, every underwriter, law firm, accountant, and investment advisor whose compensation or commission is contingent upon the completion of an initial public offering would have a motive to commit fraud making Rule 9(b) wholly meaningless. *See Melder,* 27 F.3d at 1104 ("Simply put, accepting the plaintiffs' allegation of motive as sufficient would make a mockery of Rule 9(b) by effectively eliminating the scienter requirement as to securities underwriters since all underwriters are, of course, fee seekers."); *DiLeo v. Ernst & Young,* 901 F.2d 624, 629 (7th Cir.) (accountant's audit fees did not provide motive for purposes of Rule 9(b)), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112

L.Ed.2d 312 (1990). As Judge Conboy explained:

[Plaintiffs] have alleged no gain other than the fact that the [accounting] firm was compensated for its professional services. It would defy common sense to hold that the motive element of the ... scienter analysis would be satisfied merely by alleging the receipt of normal compensation for professional services rendered, because to do so would effectively abolish the requirement, as against professional defendants in a securities fraud action, of pleading facts which support a strong inference of scienter.

*Friedman v. Arizona World Nurseries Ltd. Partnership*, 730 F.Supp. 521, 532 (S.D.N.Y. 1990), *aff'd without opinion*, 927 F.2d 594 (2d Cir.1991).

In this case, the plaintiff has made no more than a conclusory allegation that Stratton was motivated to commit fraud in order to earn its underwriting commission. But the mere fact that Stratton stood to earn its fee for performing its customary professional services is not alone sufficient to create a motive from which a strong inference of fraudulent intent may be drawn. And as explained above, the Amended Complaint does not allege how Stratton stood to benefit at all from the sales of stock held by its employees. Accordingly, the plaintiff has failed to allege sufficient motive for any of the defendants in compliance with Rule 9(b).[8]

The alternative method for pleading facts from which a strong inference of fraudulent intent may be drawn is to allege facts constituting strong circumstantial evidence of conscious misbehavior or recklessness by the defendants. The plaintiff fails to plead this alternative.

The plaintiff argues that there are many allegations of conscious misbehavior by each defendant. Among these are the allegations that the Individual Defendants possessed non-public, adverse, material information about SPG's business and financial condition

and matters relating to the IPO, (*see* Am. Compl. ¶ 12), and that the Individual Defendants were reckless in concealing such information to "prolong the illusion of SPG's success in the industry...." (Am.Compl. ¶ 13.) These allegations are vague, conclusory, and unsupported by factual allegations about the nature of the information concealed. They also appear to be unrelated to the specific omission which is alleged to be fraudulent. To the extent these allusions to concealed information refer to the alleged fraudulent omission in the prospectus of the Unaffiliated Selling Shareholders' employment relationship with Stratton, that omission, by itself, is not strong circumstantial evidence of conscious misbehavior or recklessness, particularly in light of the fact that no such disclosure is required by the applicable SEC regulations and, as discussed above, such information is not material in any event. It cannot be conscious misbehavior or recklessness for a defendant to fail to disclose in a prospectus information that is neither material nor required to be disclosed under applicable SEC regulations.

The plaintiff also argues that there are additional allegations of conscious misbehavior or recklessness, including the fact that one of the Individual Defendants, SPG director Lloyd Solomon, registered and sold 945,000 shares of SPG stock through his wholly owned company, CMC, (*see* Am. Compl. ¶ 10(b)), the fact that Stratton received underwriting commissions, (*see* Am. Compl. ¶ 22), and the fact that Stratton employees, the Unaffiliated Selling Shareholders, were able to register and sell their shares at substantial profits. (*See* Am. Compl. ¶¶ 2, 22.) None of these factual allegations even suggest conscious misbehavior on the part of SPG, the Individual Defendants, or Stratton, much less constitute strong circumstantial evidence of such misbehavior. Defendant Lloyd Solomon's relationship with CMC, CMC's holdings of SPG stock, and the fact that this stock was originally held by two officials of Stratton, was all

8. The first method for pleading scienter requires both motive and opportunity. The defendants do not seriously dispute that the Amended Complaint alleges sufficient opportunity for all of the defendants in light of their respective roles in

preparing and filing the prospectus. *See San Leandro*, 75 F.3d at 813 (in suit against company and its directors, "[t]here is no doubt that defendants as a group had the opportunity to manipulate the price of [the company's] stock").

fully disclosed in the prospectus, as were the details of the underwriting including Stratton's commission.[9] And while the employment relationship of the Unaffiliated Selling Shareholders to Stratton was not disclosed, the holdings of each of those individuals was, and there was cautionary language in the prospectus advising investors that the sales, or even potential sales, of shares held by the Unaffiliated Selling Shareholders or CMC might adversely effect the price of the stock. When the alleged non-disclosure is placed in context with the detailed information that was disclosed, including CMC's holding of SPG stock and the history of ownership of that stock, there is no basis to believe that the defendants consciously or recklessly failed to disclose that the Unaffiliated Selling Shareholders were employees of Stratton.

In short, none of the factual allegations in the Amended Complaint are strong circumstantial evidence of conscious misbehavior or recklessness on the part of any of the defendants. Accordingly, the plaintiff has failed to satisfy the pleading requirements for scienter required by Fed.R.Civ.P. 9(b) with respect to all of his claims under the Securities Act or Exchange Act with regard to all of the defendants. Therefore, the defendants motion to dismiss the complaint for failure to plead fraud with the required particularity is granted.

## IV.

Plaintiff's claim for common law fraud under New York state law is also dismissed. Because all of the claims arising under federal law are dismissed, the Court declines supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(c)(3). *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, ... the state claims should be dismissed as well."); *Block v. First Blood Assoc.*, 988 F.2d 344, 351 (2d Cir.1993) (no abuse of discretion to refuse supplemen-

tal jurisdiction over state law claims when federal claims were dismissed before trial).

## V.

 A question remains with respect to the plaintiff's application for leave to replead to cure any pleading deficiency under Fed. R.Civ.P. 9(b). Ordinarily, dismissal based on failure to plead fraud with particularity under Fed.R.Civ.P. 9(b) is without prejudice to plaintiff's filing an amended complaint to cure the deficient pleading. *See Acito*, 47 F.3d at 54–55 ("Leave to amend should be freely granted, especially where dismissal of the complaint [is] based on Rule 9(b)."); *Luce v. Edelstein*, 802 F.2d 49, 56–57 (2d Cir.1986) ("Complaints dismissed under Rule 9(b) are 'almost always' dismissed with leave to amend." (citation omitted)).

Nevertheless, it is not appropriate to grant the plaintiff's request in this case because the defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim on which relief may be granted is also granted. *See Feinman*, 84 F.3d at 542 (where district court ruled as a matter of law that no material misrepresentation was made, "[s]uch a defect cannot be cured by repleading"). The sole basis for each of the plaintiff's claims is the allegedly fraudulent omission from the prospectus relating to the Unaffiliated Selling Shareholders' employment by Stratton. That omission is not material. Therefore, even if the plaintiff repleaded scienter adequately, none of the plaintiff's claims would be sustainable because of the continued absence of any allegation of a material misrepresentation or omission. Consequently, leave to replead is denied and the Amended Complaint is dismissed with prejudice.

## CONCLUSION

For all of the foregoing reasons, the defendants' motion to dismiss the Amended Complaint is **granted** and the Amended Complaint is dismissed with prejudice. The

---

**9.** The details regarding the CMC holdings were set forth in great detail in the prospectus, including how and under what terms CMC obtained the shares and the circumstances under which they could be sold. (Prospectus at 6, 36–37, 38, 39, 40.) None of these disclosures are alleged to be inaccurate or misleading in any way.

Clerk of the Court is directed to enter judgment and to close this case.

**SO ORDERED.**