Stephen TANCREDI, et ano., Plaintiff,

v.

**METROPOLITAN LIFE INSURANCE COMPANY, et ano., Defendants.**

No. 00 CIV 5780 LAK.

United States District Court,
S.D. New York.

July 9, 2001.

Michael P. Malakoff, Malakoff Doyle & Finberg, P.C., Pittsburgh, PA, Barry A. Weprin, Milberg Weiss Bershad Hynes & Lerach, LLP, New York City, Peter Wasylyk, Law Offices of Peter Wasylyk, Providence, RI, for Plaintiff.

Bruce E. Yannett, Colby A. Smith, Carl Micarelli, Debevoise & Plimpton, New York City, Duncan J. Logan, Metropolital Life Insurance Company, for Defendants.

## MEMORANDUM OPINION

KAPLAN, District Judge.

On April 7, 2000, Metropolitan Life Insurance Company ("MetLife") converted from a mutual to a stock insurance company pursuant to New York Insurance Law § 7312, which was enacted to permit such conversions. The conversion received the required approval of the New York Superintendent of Insurance based on his finding that the plan of reorganization was fair and equitable to policy holders.

Plaintiffs bring this purported class action on behalf of MetLife policy holders pursuant to 42 U.S.C. § 1983. They claim that the conversion deprived them of their federal constitutional rights in that it took property without just compensation (Counts I and II), took their property by private sale of a near-controlling interest in the company without advance notice or opportunity to vote (Count III), deprived non-New York property holders of their rights without just compensation and thereby improperly regulated interstate commerce (Count IV), and deprived policy holders of various contractual rights in violation of the Contract Clause (Counts V–VIII). Defendants [1] have moved to dismiss the complaint primarily on the grounds that they were not state actors, that plaintiffs' membership interests in a

---

1. Defendants are Metropolitan Life Insurance Co., a New York stock company, and MetLife, Inc., a Delaware holding company.

mutual organization do not constitute property, that the McCarran–Ferguson Act[2] insulates state insurance regulation from Commerce Clause challenge, and that for any and all of these reasons the complaint fails to state a claim upon which relief may be granted. Defendants argue in the alternative that this Court should abstain from hearing the case in favor of pending state court challenges.

In resolving the motion to dismiss, the Court accepts as true the factual allegations set forth in the complaint and draws all reasonable inferences in favor of plaintiffs.[3] It may dismiss only if "it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief."[4] Although Rule 12(b) motions are made solely upon the pleadings,[5] the Court considers also those documents to which plaintiffs refer in the complaint.[6]

## I. State Action

◼ Section 1983 permits claims for violations of constitutional rights committed "under color of" state law, a phrase synonymous with the "state action" required by the Fourteenth Amendment.[7] Thus, state action is an indispensable element of each of plaintiffs' claims for relief.[8]

◼ Action taken by a private entity constitutes state action only when "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself."[9] Action by a private entity pursuant to statutory authorization retains its private character and is not actionable under Section 1983.[10]

◼ Here, plaintiffs allege nothing more than that MetLife took advantage of authority granted by the New York Insur-

**2.** 15 U.S.C. § 1011–15.

**3.** *See Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir.1996).

**4.** *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

**5.** FED. R. CIV. P. 12(b).

**6.** *See, e.g., International Audiotext Network, Inc. v. AT & T Co.*, 62 F.3d 69, 72 (2d Cir. 1995).

**7.** *Rendell–Baker v. Kohn*, 457 U.S. 830, 838, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982).

**8.** To the extent that some aspects of the motion to dismiss may be decided on non-constitutional grounds, it its this Court's obligation to do so. *See In re Treco*, 240 F.3d 148, 161–162 (2d Cir.2001) (deciding on securitization rather than constitutional takings ground because "in addressing a constitutional question whose answer would have no effect on the outcome of the case, we would have violated the 'fundamental and longstanding principle of judicial restraint [that] requires ... courts [to] avoid reaching constitutional questions in advance of the necessity of deciding them' ")

(quoting *Horne v. Coughlin*, 178 F.3d 603, 605 (2d Cir.), *cert. denied*, 528 U.S. 1052, 120 S.Ct. 594, 145 L.Ed.2d 493 (1999) (quoting *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988))). While Counts I, II, and III may be decided on non-constitutional grounds—if the membership interests did not constitute property, there can be no takings or due process claims—the remaining Counts require constitutional adjudication. Accordingly, the Court discusses state action first, as its existence is a prerequisite to a majority of claims in the Complaint.

**9.** *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 121 S.Ct. 924, 930, 148 L.Ed.2d 807 (2001) (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)).

**10.** *American Manufacturers Mutual Insurance Co. v. Sullivan*, 526 U.S. 40, 50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999); *Lugar v. Edmondson*, 457 U.S. 922, 939, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 164–65, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978).

ance Law to elect to become a stock company. The fact that the Superintendent of Insurance granted approval did not transform MetLife's election into state action. Approval by a state officer or agency, where the state "has not put its own weight on the side of the proposed practice by ordering it", does not transmute a practice initiated by the [private entity] and approved by the [state] into "state action." [11]

*Jackson v. Metropolitan Edison Co.*[12] illustrates the point. The Court there found no state action in a utility company's decision, upon state approval, to terminate a customer's electric service, noting that "the nature of governmental regulation of private utilities is such that a utility may frequently be required by the state regulatory scheme to obtain approval for practices a business regulated in less detail would be free to institute without any approval from a regulatory body." [13] The same may be said of the state's regulation of insurance companies. Indeed, a majority of courts confronted with the issue of approval of mutual-to-stock conversion plans similar to that here has found no state action.[14]

**11.** *Jackson*, 419 U.S. at 357, 95 S.Ct. 449.

**12.** *Id.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477.

**13.** *Id.* at 357, 95 S.Ct. 449. *See also American Manufacturers*, 526 U.S. at 41, 119 S.Ct. 977 ("Also rejected is ... the assertion that the challenged decisions are state action because insurers must first obtain 'authorization' or 'permission' from the [state] ....") (citing *Blum v. Yaretsky*, 457 U.S. 991, 1007, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)). *American Manufacturers* left open the issue of to what extent state approval that goes beyond "requiring the completion of a form" or other such "paper shuffling" constitutes state action. Certainly the Superintendent's detailed, 103–page report on the adequacy of the demutualization plan went beyond mere paper shuffling; but its length and depth of analysis, without more, does not imply state action under any of the criteria established for so finding. The report did not coerce the proposed activity, *see Blum*, 457 U.S. at 1004, 102 S.Ct. 2777, or significantly encourage it, *see id.*, or turn the decision to demutualize into a "joint activity" between the state and MetLife, *see Lugar*, 457 U.S. at 941, 102 S.Ct. 2744, or make MetLife a state agent, *see Pennsylvania v. Board of Directors of City Trusts of Philadelphia*, 353 U.S. 230, 231, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957), or delegate to MetLife a public function, *see Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 627–28, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), or render the state "entwined" in MetLife's "management or control," *Evans v. Newton*, 382 U.S. 296, 299, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966).

*See generally Brentwood Academy*, at 930 (listing potential criteria for finding state action).

**14.** *See Ordower v. OTS*, 999 F.2d 1183, 1187 (7th Cir.1993); *Cranley v. Nat'l Life Ins. Co. of Vermont*, 144 F.Supp.2d 291 (D.Vt.2001); *Crandall v. Alderfer*, No. 97–CV–957, 1999 WL 116293, *3 (E.D.Pa.1999). *But see Lovell v. Peoples Heritage Savings Bank*, 776 F.Supp. 578 (D.Me.1991) (finding state banking superintendent's approval of bank's mutual-to-stock conversion plan constituted state action). *Lovell* offers a detailed analysis of the Supreme Court's major decisions in the area of state action, concluding that "when private parties make use of state procedures with the overt, significant assistance of state officials, state action may be found." *Lovell*, 776 F.Supp. at 586 (quoting *Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. 478, 486, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988)). While not disputing this reading of the law, the Court declines to adopt *Lovell's* application of it. The New York Insurance Law obligated the Superintendent to approve the conversion plan if he found that the proposed plan did not violate the Insurance Law, was fair and equitable to the policy holders, and was not detrimental to the public and if, after the conversion was effected, the reorganized insurer would have an amount of capital and surplus the Superintendent deemed reasonably necessary for its future solvency. N.Y. INS. L. § 7312(j) (McKinney 2000). The Superintendent's approval under this statutory scheme did not constitute "overt, significant assistance." Rather, it reflects only the legislature's deci-

■ Nor did MetLife become a state actor on the theory that it exercised state power to "take" the property interests of the policy holders. The power to amend a corporate charter—including changes such as mergers, reorganizations and dissolutions, all of which alter the rights of stockholders—is a power that nearly all corporations long have exercised without becoming state actors.[15] Accordingly, plaintiffs have failed to allege the existence of state action.

## II. Property Interest

■ Even if plaintiffs had sufficiently alleged state action, the claims in Counts I through III of the complaint would fail because plaintiffs cannot establish that their membership interests in the mutual organization constituted property.

■ To establish a property interest, plaintiffs must demonstrate "a legitimate claim of entitlement" arising from "an independent source such as state law."[16] Plaintiffs find the source of their alleged property rights in their "contractual right," allegedly guaranteed by MetLife's 1915 charter, "to (1) ownership and control of MetLife; (2) a distribution of equity based upon historic contributions; and (3) receipt of insurance at cost through participation."[17] Yet plaintiffs right to receive a return of excess premiums as surplus (what plaintiffs term "equity") remains under the demutualization plan,[18] as does their ability as continuing policy holders to receive insurance.[19] Moreover, plaintiffs' interest in MetLife as a mutual company did not rise to the level of a property interest such as to render policy holders

sion to allow regulated companies to exercise an option under certain statutorily prescribed conditions. MetLife exercised that option independently, without encouragement from the state, and its compliance with the statutory requirements insured approval.

**15.** *See, e.g., Broad v. Sealaska Corp.,* 85 F.3d 422, 430–31 (9th Cir.1996), *cert. denied,* 519 U.S. 1092, 117 S.Ct. 768, 136 L.Ed.2d 714 (1997) (statutorily authorized transaction that altered shareholder rights not governmental action); *Ordower,* 999 F.2d at 1187 (demutualization eliminating membership rights not governmental action); *Crandall,* 1999 WL 116293, at *3 (same).

**16.** *Martz v. Incorporated Village of Valley Stream,* 22 F.3d 26, 29–30 (2d Cir.1994) (quoting *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)).

**17.** Pl. Mem. at 11–12.

**18.** *See* Cpt. Ex. D (demutualization plan) §§ 8.1(a), 8.2(d), 8.4(a); N.Y. INS. L. § 7312(a)(3) (McKinney 2000) ("the right to participate in distribution of surplus, expressly conferred upon the policy holders by their policies or contracts," not among the "mem-

bership interests" extinguished in a demutualization). Contrary to plaintiffs' assertions, the Plan does not require that dividends be calculated by a "historic plus" method, *see infra* notes 33–36 and accompanying text. In any event, plaintiffs have no right to receive dividends apportioned in a particular way, as the source of any such right is found only in the charter, *Lord v. Equitable Life Assur. Soc'y of the United States,* 194 N.Y. 212, 230, 87 N.E. 443 (1909); *Greeff v. Equitable Life Assur. Soc'y of the United States,* 160 N.Y. 19, 31, 54 N.E. 712 (1899), which is subject to amendment, *see infra* notes 25–31 and accompanying text.

**19.** It is unclear what plaintiffs mean by "at cost." To the extent they refer to their ability to obtain insurance under a "participating policy," whereby excess premiums are returned to the policyholder in the form of dividends at the company's discretion if actual expenses turn out to be lower than predicted expenses, this practice has no bearing on demutualization. Both mutual and stock companies may have participating policies. *See* N.Y. INS. L. § 4231(e)—(f) (McKinney 2000). And the participating policy holders' right to receive a return of excess premiums (what plaintiffs term "a distribution of equity") is unimpeded by demutualization. *See supra* note 18.

"owners" of the corporation. "A member of [a mutual] corporation has no definite property interest which can be ascertained and recovered .... The assets belong to the corporation, and no member has any interest in any aliquot part thereof, and the unascertained interest of a mere policy holder is quite insufficient to sustain an ... action brought to prevent the corporation from doing what the statute authorizes it to do." [20] Plaintiffs' effort to limit *Grobe*'s holding to the issue of voting rights is misplaced; *Grobe* more broadly held that the plaintiff there lacked a property interest sufficient to sustain any constitutional challenge to the New York Insurance Law.[21] And *Grobe* is not alone in finding that membership interests in a mutual company are too insubstantial to merit constitutional protection.[22]

Accordingly, plaintiffs lack a property interest upon which to assert takings or due process violations under the federal Constitution.

### III. Contractual Rights

■ Plaintiffs cite MetLife's 1915 charter as the alleged "contractual" source of their claimed property rights. They argue that the charter "recognized that MetLife, previously a stock company, had reacquired its capital stock and that it would thereafter 'continue to be a mutual company without capital stock,' and that the operation 'would have perpetual succession.' " [23] From this plaintiffs conclude that the demutualization plan constituted an unconstitutional impairment of con-

**20.** *Grobe v. Erie County Mutual Ins. Co.*, 39 A.D. 183, 186, 57 N.Y.S. 290, 292 (4th Dept. 1899), *aff'd on opinion below*, 169 N.Y. 613, 62 N.E. 1096 (1902). Although *Grobe* acknowledged that members of the company might have a property interest as a result of "some definite right secured to [them] by a contract with the corporation," 39 A.D. at 186, 57 N.Y.S. at 292, it held that the company's articles of association (similar to the charter here) were not such a contract. *Id.*

**21.** *See id.* ("I am unable to see on what theory [the insurance statutes] can be successfully challenged as unconstitutional. These statutes do not deprive any member of a mutual insurance company of any property right ....").

**22.** *See Society for Savings v. Bowers*, 349 U.S. 143, 150, 75 S.Ct. 607, 99 L.Ed. 950 (1955) (membership interests in a mutual company are contingencies that "hardly rise to the level of an expectancy"); *Ordower*, 999 F.2d at 1187 (membership interest in mutual savings and loan company "is a liquidation preference, not a transferable property right"); *York v. Federal Home Loan Bank Bd.*, 624 F.2d 495, 499–500 (4th Cir.), *cert. denied*, 449 U.S. 1043, 101 S.Ct. 621, 66 L.Ed.2d 504 (1980) (extinguishment of membership interests through savings and loan demutualiza-

tion not deprivation of property); *Lovell v. One Bancorp*, 818 F.Supp. 412, 419–21 (D.Me.1993) (same), *aff'd*, 14 F.3d 44, 1994 WL 3369 (1st Cir.1994) (table). Plaintiffs attempt to distinguish these decisions, arguing that a member of a savings and loan mutual company has a debtor/creditor relationship that subsists in a demutualization, while a member of a mutual insurance company has a "contractually vested interest" destroyed in a demutualization, which "allow[s] ... public shareholders to obtain the income and/or profits from the sale of insurance." Pl. Mem. at 23. The argument begs the question, as it is far from clear that policy holders in a mutual insurance company have any vested interest; they do not share in profits. *See* J.A.C. Hetherington, *Fact v. Fiction: Who Owns Mutual Insurance Companies*, 1969 Wis. L.Rev. 1068, 1075 n. 26 (1969) ("the mutual insurance dividend, unlike a dividend on capital stock, is a return of an overcharge and is not a distribution of earnings on profits"). Moreover, the true analogue of the creditor/debtor relationship is the insured/insurer relationship which, like the former relationship in a savings and loan demutualization, remains unaltered by MetLife's demutualization.

**23.** Pl. Mem. at 12 (citing Cpt. Ex. C Arts. VI, X).

tract.[24] They contend that the demutualization process impaired policy holders' voting rights under the charter (Count V), that it impaired policy holders' rights to surplus (Count VI), and that the New York law pursuant to which the demutualization was effected constituted an *ex post facto* law that unconstitutionally altered policy holders' various rights under the charter (Count VII).

MetLife's charter from the time of its inception was subject to statutory provisions for amending charters.[25] Moreover, the Constitution of the State of New York specifically reserves to the Legislature the right to alter laws under which corporations originally were formed.[26] Thus, "every person who became a member of the corporation did so with full knowledge that it might at any time be changed from a mutual to a stock corporation ... and that under this provision of the constitution those terms might at any time be changed by the legislature."[27] In *Polk v. Mutual Reserve Fund Life Association of New York*,[28] the Supreme Court held that a New York corporation's amendment of its charter was not an impairment of contract because the above-quoted constitutional provision put the company's members on notice that the charter could be amended, just as if there had been a notice provision in the text of the charter itself.[29] New York's constitutional provision allowed MetLife to convert from a stock to a mutual company in 1915, pursuant to the New York State Legislature's authorization to do so.[30] The same constitutional provision allows MetLife to act pursuant to the Legislature's 1988 law authorizing demutualization of domestic mutual life insurance companies.[31] Plaintiffs' claims that the Section 7312 of the New York Insurance Law is an *ex post facto* law impairing policy holders' rights under the charter are without merit.

 Similarly unavailing are plaintiffs' arguments regarding voting rights. Section 7312(k)(2) of the Insurance Law requires approval of demutualization by two-thirds of the votes cast by eligible policy holders, and it contains no requirement that a majority of policy holders have voted. Thus, the vote complied with the statutory requirements validly enacted by the New York Legislature pursuant to Article

24. *See* U.S. CONST. Art. I, § 10.

25. *See, e.g.,* N.Y. INS. L. § 1208(c) (McKinney 2000).

26. N.Y. CONST. Art. 10, § 1 ("Corporations may be formed under general laws .... All general laws and special acts passed pursuant to this section may be altered from time to time or repealed.").

27. *Grobe,* 39 A.D. at 186, 57 N.Y.S. at 292.

28. 207 U.S. 310, 28 S.Ct. 65, 52 L.Ed. 222 (1907).

29. *Id.* at 325–26, 28 S.Ct. 65 (quoting *Looker v. Maynard,* 179 U.S. 46, 52, 21 S.Ct. 21, 45 L.Ed. 79 (1900)). *See also Wright v. Minnesota Mutual Life Ins. Co.,* 193 U.S. 657, 663–64, 24 S.Ct. 549, 48 L.Ed. 832 (1904) (corporate charters may provide for their own amendment without running afoul of the constitutional provision against impairment of contracts).

30. *See* N.Y. INS. L. § 95, codified as amended, N.Y. INS. L. § 7302 (McKinney 2000); Cpt ¶ 80. *See also Lord,* 194 N.Y. at 223, 232, 87 N.E. 443 ("the right to amend, reserved in the Constitution, applies to [corporate charters], because power to amend a general law of incorporation involves power to amend charters taken out under that law"; right to amend is valid under both state and federal constitutions, as "the Legislature has wide latitude of amendment when the general power is reserved either by Constitution or statute").

31. *See* 1988 N.Y. Laws, ch. 683, codified as amended, N.Y. INS. L. § 7312 (McKinney 2000); Cpt ¶ 82.

8, Section 1 of the New York Constitution. There is simply no basis upon which to argue that the voting mechanism specified in the statute impaired any contractual rights.[32]

 Finally, plaintiffs argue that MetLife's use of a "historic plus" method for distributing net surplus, which speculates as to surplus to be earned in the future, is inconsistent with Article IX of MetLife's charter, which provided that net surplus was to be determined annually, based on the surplus actually earned in the past year.[33] The argument is simply false. Participating policy holders' right to receive a return of excess premiums is unimpeded by demutualization.[34] Moreover, plaintiffs confuse the distribution of surplus with the distribution of consideration in exchange for their membership rights in the mutual company. The Plan uses the "historic plus" method "solely for purposes of calculating the amount of ... consideration" to be provided members in the form of common stock, cash or policy credits representing the sale of stock in a public offering.[35] The Plan does not call for use of that method to allocate distributions of surplus.[36] Even if the Charter were amended to provide for a different method of surplus allocation, plaintiffs would have no contract claim because the charter may

be amended without infringing on the Constitution's prohibition on impairment of contracts.[37] Accordingly, the demutualization plan does not impair plaintiffs' right to surplus under the old charter.

### IV. Commerce Clause Claims

 Finally, plaintiffs argue that the demutualization plan violates the dormant Commerce Clause of the federal Constitution because out-of-state policy holders have a greater interest in obtaining adequate consideration for their property interests in the mutual company than has New York State in insuring the viability of its life insurance industry.[38] They argue also that the Plan's failure to assess the adequacy of consideration under the law of the states in which the policy contracts were formed constitutes a "protectionist taking." [39]

For the reasons discussed in Section II of this opinion, plaintiffs' membership interests in the mutual company do not rise to the level of a property interest sufficient to support an allegation of constitutional wrongdoing based on any theory of property rights, including a theory of a "protectionist taking". To the extent that plaintiffs' argument asserts a violation of the dormant Commerce Clause apart from any alleged property interests, it fails as well.

---

**32.** See *Polk,* 207 U.S. at 326, 28 S.Ct. 65 ("if the legislature has the constitutional power to authorize the [corporate reorganization] by a vote of the majority of the members it has the power to authorize the [reorganzation] by a vote of a majority of directors").

**33.** See Cpt ¶¶ 113–14.

**34.** See *supra* notes 18–19.

**35.** See Cpt Ex. D (Plan), §§ 7.1, 7.3.

**36.** See *id.* § 7.2(a). See also *id.* § 8.2(d).

**37.** See *supra* notes 25–31 and accompanying text.

**38.** See Cpt ¶¶ 96–103. The Commerce Clause vests Congress with the exclusive power to regulate interstate and foreign commerce. "A 'dormant' or 'negative' aspect of this grant of power is that a State's power to impinge on interstate commerce is limited." *Automated Salvage Transport, Inc. v. Wheelabrator Environmental Systems, Inc.,* 155 F.3d 59, 74 (2d Cir.1998) (quoting *Hughes v. Oklahoma,* 441 U.S. 322, 326, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979)).

**39.** Pl. Mem. at 18.

 In assessing dormant Commerce Clause challenges, courts first must determine whether the state or local law in question "regulates even-handedly with only incidental effects on interstate commerce, or discriminates against interstate commerce." [40] "In this context, 'discrimination' means different treatment of instate and out-of-state economic interests that benefits the former and burdens the latter." [41] "Non-discriminatory regulations that have only incidental effect on interstate commerce are valid 'unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.' " [42]

 In-state and out-of-state policy holders are treated identically under the Plan. [43] So there can be no serious contention that the New York Insurance Law, the Plan or the Superintendent's authorization of the conversion discriminates against interstate commerce. Rather, plaintiffs appear to allege a non-discriminatory violation, arguing that the balance of interests tips in favor of out-of state policy holders because "New York State has virtually no interest in allowing a New York mutual insurer to convert to a New York stock company that is wholly owned and controlled by a Delaware stock corporation, i.e., MetLife, Inc." [44] Plaintiffs' allegation simply is wrong as a matter of law. States obviously have an interest in regulating their own corporations—if they did

not, then all state corporate laws, which invariably affect interstate commerce, would be deemed invalid under the dormant Commerce Clause. [45] Yet even assuming that New York's interest were minimal, plaintiffs still fail to show that the burden imposed on the policy holders is "clearly excessive" in relation to that minimal interest. As discussed previously, membership interests in a mutual company do not rise to the level of constitutionally protected property, and if New York law allowed a conversion without consideration for policy holders' membership interests, it likely would survive a Fifth or Fourteenth Amendment challenge. Here, though, defendants have provided consideration. Thus, as a matter of law it cannot be claimed that the conversion places on policy holders a burden "clearly excessive" in relation to New York's interest in regulating its corporations, however minimal plaintiffs might prove that interest to be.

 Notwithstanding plaintiffs' inability to mount a dormant Commerce Clause challenge, plaintiffs' claims fail also because the McCarran–Ferguson Act, [46] which designates the regulation and taxation of the insurance business to the states, insulates state insurance regulations from Commerce Clause challenge. Plaintiffs argue that the Act does not apply because it does not grant a state the power to regulate "activities carried on beyond its own

---

40. *Automated Salvage,* 155 F.3d at 74 (quoting *Hughes,* 441 U.S. at 336, 99 S.Ct. 1727).

41. *Id.* (quoting *Oregon Waste Systems, Inc. v. Department of Environmental Quality,* 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994)).

42. *Id.* (quoting *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)).

43. *See* Cpt.¶¶ 62, 98–103.

44. Cpt. ¶ 101.

45. Congress, for one, has explicitly acknowledged states' interest in regulating their insurance companies. *See* 15 U.S.C. § 1011 (McCarran–Ferguson Act) ("The Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest . . . .").

46. 15 U.S.C. §§ 1011–15.

borders."[47] Yet the activity that is the subject of plaintiffs' complaint—the conversion from a mutual to stock company—occurred to a New York company in New York, with the approval of the New York Superintendent of Insurance. The use of a Delaware holding company as a mechanism for the transaction is entirely peripheral to the state regulation, which focuses principally on insuring adequate notice, approval, capitalization, consideration, and business continuity. Plaintiffs thus allege at most that the conversion affected interstate commerce. And the Supreme Court already has ruled on this issue.

In *Prudential Insurance Co. v. Benjamin*,[48] the Supreme Court held that the McCarran–Ferguson Act barred a dormant Commerce Clause challenge of a state tax levied on out-of-state insurance companies, noting that Congress in enacting the Act "clearly put the full weight of its power behind existing and future state legislation to sustain it from any attack under the commerce clause . . . ."[49] Even if the McCarran–Ferguson Act could be construed as nothing more than "a determination by Congress that state taxes, which in its silence might be held invalid as discriminatory, do not place on interstate insurance business a burden which it is unable generally to bear,"[50] the fact remains that the non-discriminatory burden placed on policy holders here is substantially less than the burden placed on companies subject to a discriminatory tax. Accordingly, plaintiffs fail to state a claim under the Commerce Clause.

### Conclusion

As plaintiffs have failed to allege facts which, if proved, would establish that the defendants acted under color of state law, that plaintiffs' membership interests constituted property, or that defendants' actions impaired plaintiffs' contractual rights or violated the commerce clause, the complaint fails to state a claim upon which relief may be granted. The motion to dismiss is granted.

SO ORDERED.

---

**47.** Pl. Mem. at 24–25.

**48.** 328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946).

**49.** *Id.* at 431, 66 S.Ct. 1142.

