### In re METLIFE DEMUTUALIZATION LITIGATION.

### No. 00–CV–2258(TCP)(MLO).

United States District Court,
E.D. New York.

July 23, 2001.

Jared B. Stamell, Stamell & Schager, L.L.P., New York City, for Plaintiff.

Bruce E. Yannett, Debevoise & Plimpton, Duncan J. Logan, New York City, for Defendant.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Defendants Metropolitan Life Insurance Company ("MetLife Co.") and MetLife, Inc. move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the three complaints underlying this action or, in the alternative, for a stay. For the following reasons, these motions are DENIED.

## BACKGROUND

This action arises from MetLife Co.'s conversion from a mutual life insurance company to a stock life insurance company known as MetLife, Inc. through a process known as demutualization. MetLife Co. and MetLife Inc. are the defendants in this action. Plaintiffs, seven participating MetLife Co. policyholders, filed three separate complaints in which they allege that the defendants distributed materials during the demutualization process which were materially misleading. On June 27, 2000, this Court consolidated the three actions.

The relevant facts are as follows. On September 28, 1999, MetLife Co.'s Board of Directors approved a demutualization plan ("the plan"). Under the plan, policy-

holders would exchange their membership interests, such as the right to vote on matters submitted to policyholders and the right to receive a portion of the surplus in the event that MetLife Co. was liquidated, for beneficial interests in the MetLife Policyholder Trust ("the Trust"), which was established during the demutualization. The Trust held shares of the stock in the newly formed holding company, MetLife, Inc.

To become effective, the plan had to be approved by the New York Superintendent of Insurance and by MetLife Co.'s policyholders. Policyholders were informed about the nature of the plan by, among other things, a two-part Policyholder Information Booklet ("PIB"), which MetLife mailed to policyholders. The contents of the PIB, which the plaintiffs call "the Prospectus," are at the heart of this litigation.

■ After the PIB was distributed, both the policyholders and the Superintendent approved the plan: the policyholders on February 18, 2000, when MetLife Co. reported that ninety-three (93%) percent of the nearly 2.8 million policyholders cast votes favoring demutualization, and the Superintendent on April 4, 2000, after holding a hearing. In approving the plan, the Superintendent specifically found that the plan was fair and equitable to policyholders and reiterated his approval of the policyholder notice documents, including the PIB, because they "contained sufficient

information about the proposed reorganization to enable Eligible Policyholders to make an informed decision regarding the Plan ...." (Yannett Decl. Ex. C. ¶ 216.) [1]

On April 4, 2000, the holding company, MetLife, Inc., announced its initial public offering ("IPO") of 202 million shares of common stock to be sold at $14.25 per share. The company also announced private placements of MetLife, Inc. stock. On April 7, 2000, the closing date of the IPO and the private placements, MetLife Co. became a wholly owned subsidiary of MetLife, Inc.

■ Pursuant to the demutualization plan, upon MetLife Co.'s conversion from a mutual insurance company to a stock corporation, policyholders received compensation, one form of which was the issuance of common stock, which was held in trust. The amount of stock a policyholder received was based on his status as a participating or a nonparticipating policyholder. According to the Complaint filed by Martin Gold, Mary A. DeVito, Michael A. Giannattasio, Kevin L. Hyms and Harry S. Purnell, III, participating policyholders were those policyholders who had both a statutory interest in MetLife Co.'s surplus and a right to vote on matters submitted to policyholder votes such as director elections; nonparticipating policyholders, in contrast, only had the right to vote but not the right to the surplus.[2] Under the plan, both types of policyholders received a fixed

---

1. Although the Superintendent's Opinion and Decision is not incorporated by reference in the Complaint, this Court may examine its contents without converting this motion to dismiss to a motion for summary judgment because the document is a public record and is therefore subject to judicial notice. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir.1991) (holding that a court may take judicial notice of public disclosure documents filed with the SEC on a motion to dismiss).

2. The PIB describes a participating policy as one that "(i) provides for the right to receive dividends, whether or not any dividends are actually paid; (ii) does not by its terms provide that it is nonparticipating; or (iii) is a supplementary contract, unless the supplementary contract (x) provides by its terms that it is non-participating and (y) was assumed by assumption reinsurance by MetLife." (Yannett Decl. Ex. A at 4.) Although the PIB was not attached to the Complaint, it may be considered on this motion to dismiss because the plaintiffs' claim of material mis-

amount of stock, ten shares, as compensation for the surrender of their membership interests in the mutual life insurance company. Participating policyholders were eligible for additional stock as determined by an actuarial formula which factored the participating policy's past and estimated future contributions to MetLife Co.'s surplus.

Plaintiffs claim that material information on several matters was omitted from the PIB. Although the plaintiffs admit that the PIB provided descriptions of voting rights and rights to participate in the surplus, the plaintiffs claim that it omitted information concerning

> (i) ... the value of those rights; (ii) the value of the rights of a shareholder in a Delaware corporation (without the Trust) and the costs associated with exercising those rights; and (iii) the value of those rights as beneficiaries of the Trust and the costs associated with that organizational structure.

(Gold Compl. ¶ 28.)

The plaintiffs also allege that the PIB was false and misleading because it did not contain facts showing that the distribution of shares of stock to policyholders was unfair. The distribution of stock was allegedly unfair because it overvalued the right to vote: as alleged in the Complaint, the cumulative value of the ten shares distributed to all policyholders in exchange for their membership interests was equal to approximately sixteen (16%) percent of MetLife Co.'s $13.6 billion surplus, which, according to the plaintiffs, was converted into equity upon demutualization. Plaintiffs maintain that as participating policyholders they were entitled to a greater amount of the stock issued in exchange for membership interests because only they had statutory interests in the surplus. In the plaintiffs' words, the PIB violated the Securities Act because it "is false and misleading in that it omits any discussion about the value of the equity [approximately $2 billion] allocated to voting rights of participating and nonparticipating policyholders, or that the value ascribed to voting rights is materially greater than the actual value of those rights." (Gold Compl. ¶ 34.)

Plaintiffs further allege that the PIB omitted material information regarding the differences in the expense of contesting elections in a mutual insurance company and in a stock corporation. It is axiomatic, the plaintiffs claim, that the increased costs of elections will reduce the value of policyholders' interests in MetLife, Inc.[3]

Plaintiffs filed multiple complaints alleging violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 771(a)(2). Defendants now move to dismiss.

## DISCUSSION

### 1. Rule 12(b)(6) Standard

In deciding a motion to dismiss for failure to state a claim pursuant to Rule

---

representation is based on the contents of this document, *In re Trump Hotels S'holder Derivative Litig.*, Nos. 96 Civ. 7820 DAB, 96 Civ. 8527 DAB, 2000 WL 1371317, at *14 n. 8 (S.D.N.Y. Sept. 21, 2000) and because plaintiffs clearly had notice of the document, which is integral to their claims. *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir.1991).

**3.** Plaintiffs make the following additional allegations in their opposition papers, neither of which are clearly set forth in the Complaint: MetLife filed an amendment to its registration statement several weeks after the policyholder vote which altered the value of the stock; and MetLife failed to disclose a conflict of interest with an investment firm which had advised policyholders that the demutualization was fair. (Pls.' Mem. L. Opp'n at 6.) Because these allegations are not contained in the Complaint, they are not properly before the Court.

12(b)(6), a court must accept all allegations in the complaint as true and draw all inferences in favor of the non-moving party. *Federated Conservationists of Westchester County, Inc. v. City of Yonkers*, 117 F.Supp.2d 371, 383 (S.D.N.Y.2000). A court should not dismiss a complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim. *Sunrise Indus. Joint Venture v. Ditric Optics, Inc.*, 873 F.Supp. 765, 769 (E.D.N.Y.1995).

## 2. The McCarran–Ferguson Act

■ Defendants' first argument is that the McCarran–Ferguson Act, 15 U.S.C. § 1012(b), bars the application of the Securities Act to the disclosures made by Met-Life Co. The McCarran–Ferguson Act, which was forged from a Congressional intent to "leave regulation of the insurance industry primarily to the states," *Stephens v. Nat'l Distillers & Chem. Corp.*, 69 F.3d 1226, 1228 (2d Cir.1995), alters the normal preemption rules by providing that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance . . . ." 15 U.S.C. § 1012(b) (1994).[4]

Defendants assert that Section 7312 of the New York Insurance Law, N.Y. Ins. Law § 7312 (McKinney 2000) ("Section

7312"), was enacted with the purpose of regulating the business of insurance and therefore precludes enforcement of the Securities Act, which does not specifically relate to the business of insurance. Section 7312 explains the procedures for demutualization and informs mutual insurance companies about the materials which must be distributed to policyholders before a vote on a proposed demutualization. Specifically, the statute provides that before the Superintendent of Insurance holds a public hearing on a demutualization, policyholders must receive notice of the hearing and "a true and complete copy of the plan, or . . . a summary thereof approved by the superintendent, and such other explanatory information as the superintendent shall approve or require." N.Y. Ins. Law § 7312(i),(k)(1).

■ Section 7312 does not trigger the McCarran–Ferguson Act and thereby bar the application of the Securities Act for two reasons: first, Section 7312 was not enacted with the purpose of regulating the business of insurance, and second, the Securities Act does not "invalidate, impair, or supersede" Section 7312.

■ Under the McCarran–Ferguson Act, a law is enacted with the purpose of regulating the business of insurance if the law "possess[es] the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance . . . ." *United States Dep't of Treasury v. Fabe*, 508 U.S. 491,

---

4. The history of the McCarran–Ferguson Act has been fully set forth elsewhere. For the purposes of this motion, however, this brief summary may be helpful. In 1944, the Supreme Court reversed its longstanding policy that the business of insurance was not subject to federal regulation under the commerce power. *See Humana Inc. v. Forsyth*, 525 U.S. 299, 306, 119 S.Ct. 710, 142 L.Ed.2d 753 (1999) (discussing *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 553, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944)). One

year later, in 1945, out of a concern that the Supreme Court's decision would limit state efforts to regulate insurance, Congress enacted the McCarran–Ferguson Act, which provides that " 'continued regulation and taxation by the several States of the business of insurance is in the public interest,' and that 'silence on the part of the Congress shall not be construed to impose any barrier to the regulation . . . of such business by the several States.' " *Id.* (quoting 15 U.S.C. § 1011).

505, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993) (quoting Black's Law Dictionary 1236, 1286 (6th ed.1990)). A practice or course of conduct will be considered "the business of insurance" if it meets the following three part test, none of the factors of which are necessarily determinative: "first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry." *Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982). This test helps focus the inquiry into the meaning of the business of insurance to the heart of the relationship between the insurance company and its policyholders: activities related to the drafting and performance of insurance contracts. *See Fabe,* 508 U.S. at 503, 113 S.Ct. 2202 (noting that "we do not read *Pireno* to suggest that the business of insurance is confined entirely to the writing of insurance contracts, as opposed to their performance"); *SEC v. Nat'l Sec., Inc.,* 393 U.S. 453, 460, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969) (stating that the core of the business of insurance is "the relationship between the insurer and the insured, the type of policy which could be issued, its reliability, interpretation, and enforcement . . . .").

New York Insurance Law Section 7312 *does not aim to adjust, manage, or regulate the business of insurance.* This statutory section, which merely sets forth the procedures for changing the corporate form of an insurance company from a mutual insurance company to a stock corporation, does not fundamentally alter the core relationship between the insured and the insurer. It is true that the statute's application changes the relationship between policyholders and the insurance company

to some extent. Under the statute, a policyholder's membership interests, which include voting rights and the right to receive a distribution of MetLife Co.'s surplus in the event of its liquidation, N.Y. Ins. Law § 7312(a)(3), are extinguished upon demutualization. *See, e.g.,* N.Y. Ins. Law at § 7312(d)(1)(D). However, these membership rights do not lie at the heart of the insurer/insured relationship because their elimination does not implicate the transfer of risk between an insurer and an insured in any direct way; therefore, these rights do not concern the "business of insurance." Section 7312's limited effects on insurance policies are apparent in this case, where the PIB informed policyholders that "benefits, values, guarantees and dividend eligibility will not be reduced, and [Policyholders'] Policy premiums will not be increased, in any way, due to the demutualization." (Yannett Decl. Ex. A at 7.) Because Section 7312 was not enacted with the purpose of regulating the business of insurance, the McCarran–Ferguson's special preemption rules do not apply, and the Securities Act may apply to the disclosures or the lack thereof.

Even assuming that Section 7312 was enacted for the purpose of regulating the business of insurance, enforcement of the Securities Act is not precluded because it does not "invalidate, impair, or supersede" Section 7312. Defendants argue that the Securities Act would impair or supercede Section 7312 by grafting standards on the decisions of the Superintendent of Insurance, who, under Section 7312, has discretion to choose the materials distributed to policyholders.

■ To supercede means to "to displace . . . while providing a substitute rule." *Humana,* 525 U.S. at 307, 119 S.Ct. 710. To "impair" means to hinder a law's operation or "frustrate [a] goal" of that law. *Id.*

at 311, 119 S.Ct. 710 (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 102, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)). The Supreme Court has indicated that a federal law will not impair a state law "[w]hen federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime . . . ." *Id.* at 310, 119 S.Ct. 710.

Here, the defendants argue that the Securities Act directly conflicts with the plenary power given to the Superintendent under Section 7312 to approve the content of the materials which are mailed to policyholders. Section 7312 requires insurers to mail to policyholders "such . . . explanatory information as the superintendent shall approve or require." N.Y. Ins. Law § 7312(i),(k)(1). Accordingly, the defendants argue that the Superintendent has the discretion merely to mail only a brief notice of the time and place of the vote and a one-paragraph summary of the plan, although the Securities Act may require that additional information be sent.

In *SEC v. National Securities, Inc.*, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), the Court held that the McCarran–Ferguson Act did not bar the Securities and Exchange Commission from unwinding a merger between insurance companies despite the fact that the Arizona Director of Insurance approved the merger pursuant to his State statutory powers. Arizona law provided that the Director of Insurance should not approve a merger if he found it was "[i]nequitable to stockholders of any domestic insurer; and not otherwise contrary to law." *Id.* at 457, 89 S.Ct. 564 (citing Ariz.Rev.Stat. Ann. § 20–731 (Supp. 1969)). Although the State statute was not enacted for the purpose of regulating the business of insurance to the extent that it protected the relationship between a stockholder and a stock corporation, *id.* at 460, 89 S.Ct. 564 (indicating that "[t]he crucial point is that here the State has focused its attention on stockholder protection; it is not attempting to secure the interests of those purchasing insurance policies"), the statute regulated the business of insurance to the extent that the State Director of Insurance was required to find that a merger would not reduce the security and service provided to policyholders before approving a merger. *Id.* at 462–63, 89 S.Ct. 564. In the final analysis, however, the McCarran–Ferguson Act did not preclude the SEC from unwinding the merger because the federal law only indirectly impaired the State law. *Id.* at 463, 89 S.Ct. 564. The Court reasoned that "Arizona [had] not commanded something which the Federal Government s[ought] to prohibit. It has permitted [the State] to consummate the merger; it did not order them to do so." *Id.* The Court also indicated that the McCarran–Ferguson Act did not apply because the policy behind the securities acts, protecting shareholders, was perfectly compatible with the "paramount state interest" of protecting policyholders. *Id.*

In this case, the Securities Act does not supercede State law because it does not displace any provision of Section 7312. In addition, any impairment in this case is indirect. Here, the State law has not prohibited something that the federal law commands. Rather, the application of the Securities Act would merely require that the materials distributed by mutual life insurance companies and approved by the Superintendent meet the disclosure demands of the Securities Act. Nor does Section 7312 hinder the State law's operation or frustrate a goal of the law. The notice provisions of Section 7312 appear to have been enacted for the purpose of preparing policyholders for their vote on the demutualization plan. The Securities

Act's disclosure requirements supplement this purpose by insuring that the information policyholders receive is not plagued with material misrepresentations or omissions. *See Humana Inc.,* 525 U.S. at 303, 119 S.Ct. 710 (noting that "[w]hen federal law is applied in aid or enhancement of state regulation, and does not frustrate any declared state policy or disturb the State's administrative regime, the McCarran–Ferguson Act does not bar the federal action"). Moreover, the State's administrative regime will at most be nominally affected by the application of the Securities Act. Under this statute, the Superintendent's role in the dissemination of information is relatively limited. If a mutual life insurance company chooses to mail a summary of the plan rather than a complete copy of the plan, the Superintendent must approve the summary. Additionally, the Superintendent must determine whether the policyholders should be given material in addition to the plan or a summary. *See* N.Y. Ins. Law § 7312(i),(k)(1) (providing that the mutual life insurance company must disseminate "a true and complete copy of the plan, or ... a summary thereof approved by the superintendent, and such other explanatory information as the superintendent shall approve or require"). Application of the Securities Act would not affect the State's regulatory system in any meaningful way because it would merely require that the disclosure requirements attach to a sum-

mary approved by the Superintendent or to the additional explanatory materials the Superintendent approves or requires. The burden, presumably, would be on the mutual life insurance company to submit only those materials for the Superintendent's review and approval which comply with the Securities Act. However, even if the burden fell on the Superintendent to insure that a summary of the plan or any additional explanatory materials he requires to be mailed to policyholders complies with the Securities Act, he is fully capable of fulfilling this federal mandate. The Superintendent knows the provisions of the demutualization plan and their effect on policyholders because he determines whether the demutualization plan is fair and equitable to the policyholders and is not detrimental to the public. N.Y. Ins. Law § 7312(j). He is therefore in a position to determine whether material misstatements or omissions have been made.[5]

## 3. Abstention

Defendants argue that in the event that the McCarran–Ferguson Act does not bar the application of the Securities Act, this Court should abstain from hearing this action. At the outset, as discussed further *infra*, it should be noted that although there are pending State court actions involving MetLife Co.'s demutualization, the plaintiffs in those actions are not identical to the plaintiffs here.

---

**5.** While this motion was under consideration, the Second Circuit decided *Lander v. Hartford Life & Annuity Ins. Co.,* 251 F.3d 101 (2d Cir.2001), which the plaintiffs argue is applicable to this matter. In *Lander,* the Court considered the issues of whether variable annuity contracts are "covered securities" as defined in the Securities Litigation Uniform Standards Act ("SLUSA") of 1998, Pub.L. No. 105–353, 112 Stat. 3227, (codified as amended at 15 U.S.C. §§ 77p & 78bb(f)) and whether the McCarran–Ferguson Act precluded an

interpretation of SLUSA which would preempt state regulation of insurance. *See id.* at 104. In relevant part, the Court held that the McCarran–Ferguson Act did not preclude SLUSA from applying to variable annuity contracts because SLUSA contains an explicit provision preempting state law. *Id.* at 117, 120. This case is not directly applicable here in so far as the Securities Act does not contain the same broad and explicit preemption provision.

## A. *Burford* Doctrine

In *Burford v. Sun Oil Company*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), the Supreme Court held that federal courts should abstain from hearing cases which, if resolved, would frustrate state efforts to establish a coherent policy with respect to a matter of public concern. *Id.* at 332–34. *Burford* abstention is only appropriate when federal court review would raise "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar, or if its adjudication in a federal forum would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 726–27, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996) (internal quotations and citations omitted). *Burford* abstention is only available "where the relief being sought is equitable or otherwise discretionary." *Id.* at 731–32, 116 S.Ct. 1712. In actions for damages, abstention principals may permit a court to enter a stay but do not permit an outright dismissal of the action. *See id.* at 731–32, 116 S.Ct. 1712. In cases which present mixed questions of equity and law, claims for damages may "remain in federal court while claims for equitable relief are dismissed entirely." *Johnson v. Collins Entm't. Co., Inc.*, 199 F.3d 710, 727 (4th Cir.1999).

The parties have not briefed the impact of *Quackenbush* on this case, but it appears that dismissal is not appropriate here at least in part. The plaintiffs indicate that they seek "recision or damages" in the Complaint. To the extent that the plaintiffs seek damages, dismissal of the Complaint, of course, is not appropriate. This may be why the defendants style their motion as one for dismissal or for a stay. However, because the plaintiffs also seek the equitable remedy of recision, further analysis is required.

*Burford* abstention is not appropriate here because enforcing the Securities Act's disclosure requirements would not frustrate New York's attempt to insure uniform treatment of a local problem. Enforcing the disclosure requirements will not alter the uniformity of the Superintendent's decisions about which additional materials should be sent to policyholders to inform them about the demutualization. In fact, by requiring the Superintendent to choose materials which comply with federal securities laws, the goal of uniformly advising policyholders about the benefits and detriments of a proposed demutualization plan is furthered. Additionally, while this case may touch on policy problems of substantial public import, difficult issues of state law are not involved here. The Superintendent's limited duties with respect to notifying policyholders about the demutualization are clearly set forth under the State statute. Rather, this case presents a federal question: whether the materials approved by the Superintendent should comply with the federal Securities Acts.

## B. *Colorado River* Exemption

In exceptional circumstances, a federal district court may, in its discretion, abstain from hearing a case over which it has jurisdiction in deference to a parallel duplicative action in state court. *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 818, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 15–16, 19, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Because federal courts have "a virtually unflagging obligation . . . to exercise the jurisdiction given them," a federal court must not abstain simply because a parallel state action is pending. *Colorado River*, 424 U.S. at

817, 96 S.Ct. 1236. Rather, the court must carefully balance a series of factors to determine whether the exceptional circumstances necessary for abstention are present: "(1) assumption of jurisdiction over a res; (2) inconvenience of the forum; (3) avoidance of piecemeal litigation; (4) order in which the actions were filed; (5) the law that provides the rule of decision; and (6) protection of the federal plaintiff's rights." *Williams v. Lambert,* 46 F.3d 1275, 1283 (2d Cir.1995). The decision whether to abstain must rest on a "careful balancing [of these] factors as they apply in a given case," although "the weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case." *Moses H. Cone Mem'l Hosp.,* 460 U.S. at 16, 103 S.Ct. 927.

■ Although there are actions pending in State courts relating to MetLife Co.'s demutualization, those actions are not parallel to this case. Defense counsel concedes that the parties in the Federal and State court actions are different, noting that the proposed class of plaintiffs here, the participating policyholders, is only a subset of the class of plaintiffs in the State court litigation. The putative class in the State court litigation consists of all eligible policyholders. Because the parties in the State and Federal actions are not identical, *Colorado River* abstention is not appropriate. Additionally, the State court litigation does not include claims for federal Securities Act violations, and therefore, plaintiffs' federal rights will not be enforced in State court. These factors weigh strongly against abstention, *see Alliance of Am. Insurers v. Cuomo,* 854 F.2d 591, 603 (2d Cir.1988) (stating "[s]uch differences in parties and issues are strong factors against invoking exceptional circumstances as the basis for dismissal" under the *Colorado River* doctrine), and are not outweighed by the mi-

nor inconvenience occasioned by having counsel and parties from Manhattan try a case in Central Islip, or by the parties' informal exchanges of discovery materials in the State court actions, the oldest one of which was only filed five months before this action was commenced.

### 4. Misrepresentations of Material Fact

■ Finally and alternatively, the defendants argue that the plaintiffs have not stated a claim under the Securities Act because none of the allegations in the Complaint are misrepresentations or misleading omissions of material fact.

■ Section 12(a)(2) of the Securities Act provides

> [Any person who] offers or sells a security ... by means of a prospectus ... which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission) ... shall be liable ... to the person purchasing such security from him ....

15 U.S.C. § 77l(a)(2) (Supp.1998). An omitted fact will be considered to be material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

■ In general, the materiality of statements provided in or allegedly omitted from a prospectus is a question of both law and fact, which is left to a factfinder to determine. *Geiger v. Solomon–Page Group, Ltd.,* 933 F.Supp. 1180, 1184 (S.D.N.Y.1996) (citing *TSC Indus., Inc.,* 426 U.S. at 450, 96 S.Ct. 2126). Where alleged misstatements are " 'so obviously unimportant to a reasonable investor that

reasonable minds could not differ on the question of their importance,' a court may find the misstatements immaterial as a matter of law," *Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539, 540–41 (2d Cir.1996) (citations omitted), and dismissal at the 12(b)(6) stage is appropriate. *See Geiger*, 933 F.Supp. at 1184.

▊ A company will not be liable for omitting material information if it does not draw negative conclusions about the material facts it includes in the prospectus. *See Goldberger v. Baker*, 442 F.Supp. 659, 664 (S.D.N.Y.1977) (noting that it is not a violation of Rule 10B–5 for a company to fail to characterize its deal as "unfair" or with other "pejorative" words).

The Complaint initially specifies these omissions of fact:

> In order to make an informed decision on whether to approve this kind of reorganization, policyholders needed not only the description of the rights they have to vote and participate in the surplus of a mutual insurance company under New York Insurance Law which is contained in the Prospectus, but also (i) information about the value of those rights; (ii) the value of the rights of a shareholder in a Delaware corporation (without the Trust) and the costs associated with exercising those rights; and (iii) the value of those rights as beneficiaries of the Trust and the costs associated with that organizational structure.

(Gold Compl. ¶ 28.) The plaintiffs further allege that the PIB was materially misleading in its discussion of the allocation of shares between participating and nonparticipating policyholders. Both nonparticipating and participating policyholders received a fixed amount of stock, ten shares, as compensation for their voting rights, although only participating policyholders received an additional variable amount of stock, depending on their contributions to MetLife Co.'s surplus. The participating policyholders allege that the nonparticipating policyholders received a "windfall" because the right to vote was overvalued. (Gold Compl. ¶ 34.) The PIB, according to the plaintiffs, is false and misleading because it does not "provide any information to support the allocation of shares in this manner or to show that the allocation is fair" (Gold Compl. ¶ 31) and because it "omits any discussion about the value of the equity [approximately $2 billion] allocated to voting rights of participating and nonparticipating policyholders, or that the value ascribed to voting rights is materially greater than the actual value of those rights." (Gold Compl. ¶ 34.)

The plaintiffs also claim that the PIB was misleading in that it did not adequately explain the methodologies and costs associated with contesting elections. The plaintiffs claim that the PIB failed to inform policyholders that upon demutualization "any policyholder wanting to nominate a slate would have to pay the expense of soliciting votes from Trust beneficiaries" (Gold Compl. ¶ 35), but as a mutual insurance company, MetLife Co. was required by statute to pay the costs of the election. The plaintiffs also claim that the PIB failed to disclose that a trust beneficiary does not have the right to inspect and make copies of the shareholder list and that "by establishing the Trust with rules that insulate MetLife's Board from shareholder votes, the value of the policyholder's beneficial interests in the Trust and the underlying MetLife, Inc. stock will be reduced." (Gold Compl. ¶ 37). The plaintiffs further contend that the PIB failed to discuss the fact that "[o]ther than in a contested election, under the demutualization plan, a policyholder will have no vote on how MetLife is managed or by whom." (Gold Compl. ¶ 35.)

The defendants argue that they did not omit material facts by not disclosing the value of membership rights because those rights did not have value, as there was no market for them. Had the defendants placed a value on membership rights, they argue, they would have only misled policyholders. In fact, it appears that the defendants did at some point place a value on membership rights. At the time of the demutualization, these rights were worth ten shares of MetLife, Inc. stock. The issue here is whether the PIB adequately disclosed MetLife's formula for determining that these rights were worth ten shares of stock. Although the PIB does in fact inform policyholders about the method of a locating shares and contains a summary of the actuarial methodologies used to compute the variable component of the compensation, it apparently does not offer an actuarial basis for the decision to distribute ten shares of stock to all policyholders. It does contain, however, an opinion from PriceWaterhouseCoopers, buried at the end of part two of the voluminous PIB, which indicates that the universal ten-share distribution "is appropriate as well as consistent with the approach used in previous demutualizations." (Yannett Decl. Ex. B at A–14.) It may not be said as a matter of law that the defendants' omission of a further explication of the facts behind the choice of ten-share fixed component is so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of its importance. Accordingly, dismissal is not appropriate at this juncture on this ground.

■ The plaintiffs may also proceed on a theory that the defendants failed to inform policyholders that before demutualization MetLife Co. had to pay the costs of a contested election but after demutualization those costs would be borne by a poli-cyholder who wished to nominate an opposing slate. While it is true that New York law generally forbids mutual life insurance companies from paying the expenses of contested elections, see N.Y. Ins. Law § 4210(m)(2) (McKinney 2000) (providing "[e]xcept where such expenditure is otherwise authorized or required by this section, no money of the company shall be expended in connection with any such election or in canvassing therefor, and no officer or agent of the company shall directly or indirectly make any advance or loan of such moneys to any person in connection with or for the purpose of such election or canvass unless the expenditure or loan is in a contested election and shall be limited to reasonable amounts authorized by the board of directors of the company and approved in advance by the superintendent"), mutual life insurance companies are required to pay for the mailing of ballots and blank proxies to all policyholders who are eligible to vote. Id. at (i)(1)(A),(D). Whether it was a material omission for the defendants to fail to disclose this change in the costs of contesting an election is a jury question.

■ The defendants argue that they did not have to disclose the costs and procedures for contesting elections in mutual life insurance companies because this information is set forth in the New York insurance law. But Plaintiffs claim that the PIB omitted a comparison between these costs before and after demutualization and a conclusion that the costs of contesting an election are greater if MetLife is a stock company. Although the Securities Act did not require MetLife Co. to verbalize all negative inferences, see Klamberg v. Roth, 473 F.Supp. 544, 551–52 (S.D.N.Y.1979), it cannot be said as a matter of law that a reasonable policyholder would have been able to make the appropriate inference about the costs of elec-

tions from the facts disclosed. *See Sable v. Southmark/Envicon Capital Corp.*, 819 F.Supp. 324, 334 (S.D.N.Y.1993) (noting that "[a] reasonable investor will not be deceived by nondisclosure of inferences if he or she can draw whatever inferences might be appropriate based on disclosed facts"). This must be an issue for the jury. For the same reasons, the plaintiffs' claim that the defendants should have further disclosed the costs of doing business as a trust also survives this motion.

### 5. Recovery

■ The defendants next argue that if it is assumed that the plaintiffs proved a Section 12(a)(2) violation, their recovery would be zero because they received valuable stock in exchange for their membership interests, which had no monetary value. (Defs.' Reply Mem. L. at 7) (citing *e.g., Paulsen v. Comm'r*, 469 U.S. 131, 140, 105 S.Ct. 627, 83 L.Ed.2d 540 (1985) for the proposition that mutual membership interests are 'insubstantial' and 'unquantifiably small'; their 'incremental value ... [i]s, practically zero'); *accord Tancredi v. Metro. Life Ins. Co.*, 149 F.Supp.2d 80, 86–87 (S.D.N.Y.2001) (holding in part that membership interests in MetLife Co. were not constitutionally protected property interests).[6] The difficulty with defendants' argument in this case is that the defendants placed and thereby acknowledged a value on nonparticipating members membership interests, i.e., a minimum of $14.25 per share or $142.50 per policyholder. Everything of course is relative and if it is assumed as defendants argue that the interests were of no value prior to this action then each nonparticipant not only received a "windfall" as plaintiffs claim but they also received an estimable interest in fu-

ture retained earnings of the new corporation.

■ The defendants are correct that Section 12(a)(2) offers the plaintiffs two avenues for relief: recision or damages. If a plaintiff still owns the stock, he is entitled to recision and may recover the consideration paid for the securities plus interest less any amount of income he received. *See Wigand v. Flo–Tek*, 609 F.2d 1028, 1035–36 (2d Cir.1979). On the other hand, if the plaintiff no longer holds the stock, he may only receive damages. *See id.* at 1035. Damages equal "the excess of what [he] paid over the value of what he got." *Fershtman v. Schectman*, 450 F.2d 1357, 1361 (2d Cir.1971) (citation omitted). But the defendants' arguments are not appropriate at this juncture. On a motion to dismiss, the plaintiff need only allege

1) [d]efendants offered or sold a security; 2)[b]y the use of any means of communication in interstate commerce; 3)[t]hrough a prospectus or oral communication; 4)[b]y making a false or misleading statement of a material fact or by omitting to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; 5)[p]laintiff did not know of the untruth or omission; and 6)[d]efendants knew, or in the exercise of reasonable care, could have known of the untruth or omission.

*In re MobileMedia Sec. Litig.*, 28 F.Supp.2d 901, 924 (D.N.J.1998) (quoting *Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682, 687–88 (3d Cir.1991)); *see also In re AMF Bowling Sec. Litig.*, No. 99 CIV. 3023(DC), 2001 WL 286758, at *3 (S.D.N.Y. March 23, 2001) (noting that to

---

**6.** This Court has considered Judge Kaplan's thorough opinion. Although the dispute in that case also arose from policyholders' dis-

satisfaction with the demutaulization, the issues decided therein are not the same as those presented here.

state a claim under Section 12(a)(2), "plaintiffs must demonstrate that the Prospectus contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading"). At this stage, plaintiffs do not have to allege damages. *But cf. Goodridge v. Harvey Group, Inc.,* 778 F.Supp. 115, 129 (S.D.N.Y.1991) (noting that to establish liability under Section 12(a)(2), a plaintiff must suffer cognizable damages). Accordingly, the defendants' argument is more properly made in a summary judgment context and will not be addressed further at this time.

## CONCLUSION

For the reasons stated above, the defendants' motion to dismiss or stay is denied.

SO ORDERED.